G. Peter HONCHOK et al.

v.

Clifford M. HARDIN, Secretary of Agriculture of the United States, a Maryland resident; American Smelting & Refining Company, a Delaware corporation.

Civ. No. 70–942.

United States District Court,
D. Maryland.

May 14, 1971.

Leonard J. Kerpelman, Baltimore, Md., for plaintiffs.

George Beall, U. S. Atty., and J. Frederick Motz, Asst. U. S. Atty., Baltimore, Md., and Frederick L. Miller, Jr., Atty., Dept. of Justice, for Secretary of Agriculture.

Lewis A. Noonberg and Piper & Marbury, Baltimore, Md., and Daniel M. Gribbon, Richard B. Herzog and Covington & Burling, Washington, D. C., for American Smelting & Refining Co.

THOMSEN, District Judge.

This is an action brought against the Secretary of Agriculture and American Smelting and Refining Company seeking to protect the Challis National Forest in the State of Idaho.

Plaintiffs are a citizen of West Virginia and a citizen of Maryland; the latter sues individually and as President of the North American Habitat Preservation Society, a Pennsylvania corporation.[1] They sue on their own behalf and on behalf of others similarly situated.

---

1. The corporation is alleged to be a conservation organization with over 4,000 members, mostly young, who are interested in the preservation of a "viable habitat and environment" and have and will participate in "all the valid uses of the National Forest, including recreational, environment-preservation uses, and just looking and having."

Plaintiffs seek (1) a declaratory judgment that the General Mining Law of 1872 (Act of May 10, 1872, c. 152, 17 Stat. 91, 30 U.S.C.A. § 21 et seq.) is unconstitutional; (2) an injunction restraining the Secretary of Agriculture, one of the defendants, from implementing any mining or other claim validation provisions of said law and, particularly, from permitting the other defendant, American Smelting and Refining Company, or anyone else, from "trespassing" upon the Challis National Forest, in the State of Idaho, for the purpose of conducting mining operations or explorations; and (3) a mandatory injunction directing the Secretary "to exercise his ministerial duty which exists, of preventing destructive trespasses upon any national forest, and, more particularly, upon the Challis National Forest, and to prevent the entry of persons whose intention is to mine or prospect thereon". Plaintiffs allege that the corporate defendant is preparing to mine molybdenum in the Challis National Forest,[2] and has applied to the Secretary for a "road permit" which he intends to grant.

Jurisdiction is claimed under 28 U.S.C. §§ 1331(a), 1332(a) and 1361, venue under 28 U.S.C. § 1391(a), (b), (c) and (e). A three-judge court is requested. 28 U.S.C. § 2282.

The Secretary of Agriculture is said to reside in Maryland. The corporate defendant, a Delaware corporation with its principal office in New York, regularly carries on business in Maryland.

The Secretary has moved to dismiss the complaint for lack of jurisdiction and venue, for lack of standing, and on the merits. The corporate defendant does not question jurisdiction or venue, but has moved to dismiss for lack of standing and lack of a substantial constitutional question.

## I

■ A single judge to whom an application for an injunction is presented must determine whether a substantial constitutional question is raised before notifying the Chief Judge of the Circuit that a statutory three-judge court should be constituted. Jacobs v. Tawes, 250 F. 2d 611, 614–615 (4 Cir. 1957); Maryland Citizens for a Representative General Assembly v. Governor of Maryland, 429 F. 2d 606, 611 (4 Cir. 1970); Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933); Goldstein v. Cox, 396 U.S 471, 478, 90 S.Ct. 671, 24 L.Ed.2d 663 (1970); Britton v. Bullen, 275 F.Supp. 756, 760–761 (D.Md.1967), mandamus denied, sub. nom. Britton v. Thomsen, 390 U.S. 979, 88 S.Ct. 1110, 19 L.Ed.2d 1287 (1968). In the *Maryland Citizens* case, the Fourth Circuit said:

" * * * Insubstantiality in the claim may appear because of absence of federal jurisdiction, lack of substantive merit in the constitutional claim, or because injunctive relief is otherwise unavailable. Such insubstantiality may be evident from the frivolous nature of the claim or from previous decisions of the Supreme Court which require an adverse answer. When it thus appears that there is no substantial question for a three-judge court to answer, dismissal of the claim for injunctive relief by the single district judge is consistent with the purpose of the three-judge statutes, and it avoids the waste and delay inherent in a cumbersome procedure." 429 F.2d at 611.

## II

■ Although the Secretary of Agriculture may have a residence in Maryland, he is not being sued individually, but in his official capacity as a federal official. His official residence is in the

---

2. Molybdenum deposits in the Challis National Forest are discussed in the United States Geological Survey Bulletin No. 11–82–E, "Investigations of Molybdenum Deposits in Conterminous United States, 1942–60", 52 (U. S. Government Printing Office, 1965).

District of Columbia; he is not a citizen of Maryland within the meaning of 28 U.S.C. §§ 1332(a) or 1391(a) and (b). Butterworth v. Hill, 114 U.S. 128, 132, 5 S.Ct. 796, 29 L.Ed. 119 (1885); Stroud v. Benson, 254 F.2d 448, 451–452 (4 Cir. 1958); Berlinsky v. Woods, 178 F.2d 265 (4 Cir. 1949), cert. den., 339 U.S. 949, 70 S.Ct. 805, 94 L.Ed. 1363 (1950); Walters v. Payne, 292 F. 124, 126 (3 Cir. 1923). Section 1391(c) does not apply because "each defendant" is not an officer or employee of the United States.

The motion to dismiss filed on behalf of the Secretary must, therefore, be granted and the case dismissed as to him.[3]

### III

■■ With the Secretary out of the case, we have as plaintiffs a West Virginia citizen, a Maryland citizen, and a Pennsylvania corporation with its principal office in Maryland, and as the sole remaining defendant a Delaware corporation with its principal office in New York. Diversity jurisdiction, therefore, exists. The complaint also raises a federal question. There is now no problem as to venue, because the corporate defendant carries on business in Maryland, and has not challenged venue. 28 U.S.C. § 1391(c).

The United States, through the United States Attorney, has agreed that it received adequate notice of the hearing held on April 22, 1971.

### IV

■ The issue of standing leads into a rapidly developing field. See Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Ass'n of Data Processing Services v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970);

Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); West Virginia Highlands Conservancy v. Island Creek Coal Co., 441 F.2d 232 (4 Cir. 1971), and cases and law review articles cited therein, particularly Sierra Club v. Hickel, 433 F.2d 24 (9 Cir. 1970), cert. granted, 401 U.S. 907, 91 S.Ct. 870, 28 L.Ed.2d 805 (1971). The Federal Government has been encouraging the citizens of all the States to use and enjoy the National Parks, National Forests and National Seashores. This Court is loath to dismiss such a case as this for lack of standing until the Supreme Court decides Sierra Club v. Hickle or the Fourth Circuit issues a controlling decision.

### V

■ The complaint must, however, be dismissed on the merits because the constitutional claim is insubstantial. Plaintiffs do not specify what provision of the Constitution is being violated. Their complaint alleges merely that: "Challis National Forest is public land owned by all the people of the United States, in common, and it is held in trust for them, along with other public lands, by the United States for public beneficial uses only, and for no uses which would not have been allowed to the sovereign of lands which he held *jus publicum* according to the common law of England, as that law was understood in 1781; by virtue of which fact it is unconstitutional today for the Defendant Hardin to permit the acts complained of * * *"; and that: "It is unconstitutional for the Defendant Hardin to dispose of said lands, generally, or to permit the uses complained of, as the lands are owned by the Plaintiffs, or by the people, or

---

3. Since the Secretary must be dismissed, the Court need not decide whether jurisdiction would lie under 28 U.S.C. § 1361. A mandamus will ordinarily be issued against an officer of the United States only to perform a ministerial duty and not to exercise his discretion in a particu-

lar way. Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 50 S.Ct. 320, 74 L.Ed. 809 (1930); Prairie Band of Pottawatomie Tribe of Indians v. Udall, 355 F.2d 364 (10 Cir.), cert. den., 385 U.S. 831, 87 S.Ct. 70, 17 L.Ed.2d 67 (1966).

by the United States, and the lands are not owned by any of the Defendants".

Plaintiffs' briefs are no more enlightening. Indeed, in the first case they cite, United States v. San Francisco, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940), the controlling principle is stated flatly: "And it is not for the courts to say how that trust shall be administered. That is for Congress to determine". 310 U.S. at 29–30, 60 S.Ct. at 756. This ruling, reiterated in later cases, also answers plaintiffs' concluding point, which reads in its entirety: "And what about the Ninth Amendment? Has not the power to give away, or dispose of, lands of this nature been reserved in the people, so that Congress does not have it?"

The disposition of minerals in lands owned by the United States is by express constitutional grant the responsibility of Congress. Art. 4, § 3, cl. 2 of the Constitution. In Alabama v. Texas, 347 U.S. 272, 74 S.Ct. 481, 98 L.Ed. 689 (1954), the Court said:

" * * * The power of Congress to dispose of any kind of property belonging to the United States 'is vested in Congress without limitation.' United States v. Midwest Oil Company, 236 U.S. 459, 474 [35 S.Ct. 309, 59 L.Ed. 673]: 'For it must be borne in mind that Congress not only has a legislative power over the public domain, but it also exercises the powers of the proprietor therein. Congress "may deal with such lands precisely as a private individual may deal with his farming property. It may sell or withhold them from sale." Camfield v. United States, 167 U.S. [518] 524 [17 S.Ct. 864, 42 L.Ed. 260]; Light v. United States, 220 U.S. [523] 536 [31 S.Ct. 485, 55 L.Ed. 570]'; United States v.

San Francisco, 310 U.S. 16, 29–30 [60 S.Ct. 749, 84 L.Ed. 1050]; 'Article 4, § 3, Cl. 2 of the Constitution provides that "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory and other Property belonging to the United States." The power over the public land thus entrusted to Congress is without limitations. "And it is not for the courts to say how that trust shall be administered. That is for Congress to determine." ' United States v. California, 332 U.S. 19, 27 [67 S.Ct. 1658, 91 L.Ed. 1889] * *." 347 U.S. at 273, 74 S.Ct. at 481.[4]

In United States v. Coleman, 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968), rehearing denied, 391 U.S. 961, 88 S.Ct. 1834, 20 L.Ed.2d 875 (1968), the Court stated, in footnote 1: "The cornerstone of federal legislation dealing with mineral land is the Act of May 10, 1872, 17 Stat. 91, 30 U.S.C. § 22, which provides in § 1 that citizens may enter and explore the public domain and, if they find 'valuable mineral deposits,' may obtain title to the land on which such deposits are located by application to the Department of the Interior. The Secretary of the Interior is 'charged with seeing * * * that valid claims * * * [are] recognized, invalid ones eliminated, and the rights of the public preserved.' Cameron v. United States, 252 U.S. 450, 460 [40 S.Ct. 410, 412, 64 L.Ed. 659]." 390 U.S. at 600, 88 S.Ct. at 1329.

Under the Mining Act of 1872, as amended from time to time, the locator of a "valuable mineral deposit" obtains a possessory interest which includes (1) certain rights in a surface area around the deposit, within statutorily described dimensions,[5] and (2) most, but not all,

---

4. Mr. Justice Reed concurring, added: "The United States holds resources and territory in trust for its citizens in one sense, but not in the sense that a private trustee holds for a *cestui que trust*. The responsibility of Congress is to utilize the assets that come into its hands as sovereign in the way that it decides is best for the future of the Nation. * * *" 347 U.S. at 277, 74 S.Ct. at 483.

5. 30 U.S.C. §§ 23, 28, 35, 36. For limitations on use of the surface to mining-related activities, see United States v. Coleman, supra, 390 U.S. at 602, 88 S.Ct. 1327, 20 L.Ed.2d 170; Multiple Surface Use Act of 1955, 69 Stat. 368, 30 U.S.C. § 612(a); United States v. Rizzinelli, 182 F. 675, 680–682 (N.D.Idaho 1910).

minerals lying within the surface boundary lines extended vertically downward into the earth, and certain veins which extend beyond those lines.[6] Unless the locator performs a certain dollar amount of labor or improvements each year, the claim becomes subject to relocation by others.[7] When the investment in a claim has reached a specified aggregate amount, the locator may apply for a patent to the land, which ordinarily is a fee simple title.[8] Surface rights on certain claims are, however, still limited after patent to mining activities. See for example, the provisions with respect to patents issued under the mining laws affecting lands within certain national forests, 16 U.S.C. §§ 482, 482a–p. Challis National Forest is not one of those so protected. And see the Wilderness Act of 1964, 78 Stat. 890, 893, 16 U.S.C. §§ 1131, 1133(d) (3).

The President is authorized by statute to declare forest-bearing lands owned by the United States to be national forests, for the purposes of improving and protecting the forests, securing favorable conditions for water flows, and furnishing a continuous supply of timber for the use and necessities of citizens. 16 U.S.C. §§ 471, 475. It is "not the purpose or intent of these provisions * * * to authorize the inclusion [in national forests] of lands more valuable for the mineral therein, or for agricultural purposes, than for forest purposes." 16 U.S.C. § 475. Accordingly, mineral lands "subject to entry under the existing mining laws * * * shall continue to be subject to such location and entry * * *," 16 U.S.C. § 482, and persons may not be prohibited from entering national forests for all "lawful purposes" including specifically "prospecting, locating, and developing the mineral resources thereof".[9] Activities carried out by such persons on lands which have the status of national forest and which are outside the surface boundaries of a claim must be in accordance with the rules and regulations covering the national forest.[10] Thus, if a mineral locator wishes to gain access to his claim by means of a road across national forest lands not within the boundaries of his claim, he must first obtain a permit for such activity from the Forest Service in the Department of Agriculture.[11]

While wilderness and recreational values may result from the creation of national forests, and Congress has recognized this fact, see 16 U.S.C. § 497, the purposes for which national forests may be created, and in accordance with which they are to be "as far as practicable controlled and administered", 16 U.S.C. § 475, contrast with the express references to recreational and wilderness values found in the statutes creating the National Park Service to administer national parks, 39 Stat. 535 (1916), 16 U.S.C. § 1, and the Wilderness Preservation System, 78 Stat. 890 (1964), 16 U.S.C. § 1131. The methods chosen by Congress to achieve the objective of the development of the mineral resources of the nation have varied from time to time. Although particular aspects of the 1872 Act have been modified, Congress has repeatedly affirmed the desirability of its basic concepts and principles.[12]

The exercise of the power of Congress under Art. 4, § 3, cl. 2 of the Constitution involves economic, techno-

6. 30 U.S.C. §§ 35–36. See also 30 U.S.C. § 181 et seq.

7. 30 U.S.C. §§ 28, 28–1.

8. 30 U.S.C. § 29.

9. 16 U.S.C. § 478.

10. 16 U.S.C. §§ 472, 478, 551.

11. See 16 U.S.C. § 551; 36 C.F.R. § 251.1.

12. See, e. g., 48 Stat. 1269, 1272 (1934), 43 U.S.C. §§ 315, 315e (lands established as grazing districts remain open to mineral discovery); 30 Stat. 34, 36 (1897), 16 U.S.C. §§ 475, 478 (lands declared to be national forests remain open to mineral discovery); 69 Stat. 368 (1955), 30 U.S.C. § 612(b) (giving United States the right to manage surface vegetative resources on certain mining claims prior to patent so long as there is no material interference with mining).

logical, and philosophic considerations, often requiring choice (1) among various surface uses, such as grazing, irrigation, hydroelectric power, forest management, wildlife refuge, watershed management, and various recreational facilities to serve a wide range of abilities and tastes; and (2) between surface and subsurface uses (mineral developments) where such uses are mutually exclusive.[13]

Choices involving these issues are reflected not only in the General Mining Law of 1872, but in subsequent enactments by Congress, some of which are quite recent, which have affected the development of mineral resources by limiting the right of private persons to develop such resources in certain geographic areas (see 16 U.S.C. §§ 482, 482a–p, discussed above),[14] or with respect to certain minerals, or time periods. See e. g., 62 Stat. 580 (1948), 16 U.S.C. § 678a (congressional grant of authority to prohibit mining in specified areas within Harney National Forest); Mineral Lands Leasing Act of 1920, 41 Stat. 437, 451 (1920), 30 U.S.C. §§ 181, 193 (removing oil, and certain named hard minerals, from coverage of 1872 Act);

Common Varieties Act, 69 Stat. 368 (1955), 30 U.S.C. § 611 (removing common varieties of certain substances from coverage of 1872 Act); Wilderness Act of 1964, 78 Stat. 893, 895, 16 U.S.C. § 1133(d) (3) (1872 Act not to apply after midnight, December 31, 1983, in areas designated as "wilderness").[15]

Plaintiffs note that the legislative history of the 1872 Act indicates that it was intended for a simpler time than the present.[16] It is true that certain problems with respect to conservation and environment have arisen in recent years which were not foreseen a century ago. Congress may well wish to reevaluate the priorities between the conflicting interests exemplified by the present case, but under the Constitution that review is for Congress and not the courts. The statutes discussed above and the other statutes passed by Congress with respect to Mineral Rights and Mining, 30 U.S.C., and Conservation, 16 U.S.C., are not unreasonable means of dealing with the responsibilities of Congress in these areas.

A judgment dismissing the complaint will be entered.

13. A choice among various subsurface uses may also be involved. See Multiple Mineral Development Act, 68 Stat. 708 (1954), 30 U.S.C. § 521 et seq.

14. This pattern is as old as the General Mining Law itself, for two months before it was passed (17 Stat. 91) the same Congress created by statute Yellowstone National Park, in which mining was not allowed. 17 Stat. 32 (1872).

15. This Act was passed "to assure that an increasing population * * * [and] expanding settlement * * * does not * * * modify all areas within the United States * * * leaving no lands * * * in their natural condition * * *." 78 Stat. 890, 16 U.S.C. § 1131(a). At passage, approximately nine million acres were set aside as "wilderness areas" to be maintained so that "the imprint of man's work [is] substantially unnoticeable", for example, without roads. 78 Stat. 891, 894, 16 U.S.C. §§ 1131(c), 1133(c); H.R.Rep.No.1538, 88th Cong.2d Sess.1964, in 2 1964 U.S.Code Cong. and Admin.News pp. 3615–17. At least another five million acres are, by express congressional directive, under review by the Secretaries of Interior and Agriculture to determine suitability for "wilderness" status under the Act. 78 Stat. 891–892, 16 U.S.C. § 1132(b), (c), 1964 U.S.Code Cong. and Admin. News, at pp. 3616–18.

16. See Congressional Globe for January 23, 1872, Volume 45, p. 532.