577 P.2d 9

AVONDALE IRRIGATION DISTRICT, Dalton Gardens Irrigation District, and Hayden Lake Irrigation District, Plaintiffs,

v.

NORTH IDAHO PROPERTIES, INC., an Idaho Corporation, et al., Defendants,

and

United States of America, Intervenor-appellant,

and

Robert J. Adamson et al., and R. Keith Higginson, Director of Water Administration, Idaho State Department of Water Administration, Intervenor-respondents.

John SODERMAN and Martha Soderman, husband and wife, Farrell Stoor and Margaret Stoor, husband and wife, Frank Stoor and Pat Stoor, husband and wife, Oscar Vias and Verda Vias, husband and wife, Alfred Vias, a single man, Jack Nuffer and Phyllis Nuffer, husband and wife, Leith R. Somson and Virginia Somson, husband and wife, and Dan Moran, a single man, Plaintiffs,

v.

Dr. Evan KACKLEY and Lois Kackley, husband and wife, J. C. Smith and Vera D. Smith, husband and wife, Blue Mountain Grazing Association, Inc., a corporation, United States of America through the United States Forest Service, Department of Agriculture, the Bureau of Indian Affairs, Department of the Interior, the State Engineer, Department of Reclamation, State of Idaho, Defendants.

R. Keith HIGGINSON, Director, Idaho Department of Water Resources, Cross-claimant, Appellant,

v.

UNITED STATES FOREST SERVICE, Cross-defendant, Respondent.

Nos. 12174, 12482.

Supreme Court of Idaho.

March 15, 1978.

Rehearing Denied May 1, 1978.

Wayne L. Kidwell, Atty. Gen., Josephine
P. Beeman, Asst. Atty. Gen., Boise, for
Dept. of Water Resources.

Paul L. Westberg, U. S. Atty., Boise, Larry G. Gutterridge, U. S. Dept. of Justice, Washington, D. C., for United States.

BAKES, Justice.

These two cases, which have been consolidated on appeal, raise common issues concerning federal reserved water rights for non-consumptive use to the natural flow of several streams in two national forests.[1] A brief statement of the cases' histories will place these common issues more clearly in focus.

I

*Soderman v. Kackley.* This action was originally commenced by private parties to adjudicate their water rights in Gravel, Lincoln (Harrison) and Wayne Creeks in Caribou County. The Department of Water Resources and the United States were named as defendants.[2] In its answer, the United States asserted as an affirmative defense that under the federal reservation doctrine it had non-consumptive water rights to the entire natural flow of these three creeks from the point where they arise in the Caribou National Forest to the point where they exit that national forest. The United States claimed that water right dated from January 15, 1907, the date the Caribou National Forest was reserved pursuant to presidential proclamation. The

Department of Water Resources filed a cross complaint against the United States disputing the validity of that non-consumptive water right.

 Following a trial in November of 1974, the district court found that the entire natural flow of these streams was necessary to preserve the forest ecosystems and fish and wildlife, to serve as fire barriers, and for recreational and aesthetic purposes. The district court concluded that these purposes were among those for which the Caribou National Forest was created, and therefore, under the federal reserved water rights doctrine, the United States was entitled to the non-consumptive water rights it claimed. A judgment to this effect was entered on April 14, 1975. However, because private parties had requested additional time to submit material for incorporation in a stipulation, that judgment did not adjudicate the water rights of those private parties. The Department of Water Resources appealed that judgment, but this Court dismissed the appeal because no final judgment had been entered adjudicating all the water rights between all the parties. *Soderman v. Kackley (Soderman I)*, 97 Idaho 850, 555 P.2d 390 (1976). After a judgment determining the rights of the other parties had been entered by the district court, the Department filed this second appeal.[3]

1. The consumptive water rights of private parties and the United States are also involved in both cases. However, in both cases these claims were either resolved by stipulation or in earlier proceedings, and therefore issues concerning consumptive water rights are not raised in these two appeals.

2. The district court limited the issues to an adjudication of the rights *inter sese* of the parties to water in these three creeks, which are tributaries of Gray's Lake. The district court left open for future judicial determination the rights of the United States and others to water in Gray's Lake which may also involve some rights to contribution from these creeks.

3. The judgment granting the water rights claimed by the United States was entered April 14, 1975. The first appeal was filed June 13, 1975. On July 2, 1976, the district court entered the judgment adjudicating the rights of the other parties. We dismissed the first ap-

peal September 17, 1976, for lack of a final judgment. The dismissal of the appeal was filed in the district court November 2, 1976. The second appeal was filed December 29, 1976. When the judgment adjudicating the water rights of the other parties, the absence of which in the record prompted this Court's dismissal of the first appeal, was entered on July 2, 1976, the water rights between all the parties had been adjudicated. That suggests a jurisdiction problem under I.C. § 13–201 because this second appeal was not filed until December 29, 1976, more than 60 days after the entry of the second judgment. (I.C. § 13–201 has been repealed and replaced by Rule 14, Idaho Appellate Rules (I.A.R.), effective July 1, 1977, but still controls the time for filing appeals from judgments entered before July 1, 1977. I.A.R. 1.) However, neither the judgment entered April 14, 1975, nor the judgment entered July 2, 1976, is a final judgment adjudicating the rights of all the parties. Hence, neither of

## II

*Avondale Irrigation Dist. v. North Idaho Properties, Inc.* This action was originally commenced by three Idaho irrigation districts to adjudicate water rights in Hayden Lake and its tributaries. The United States, as an intervenor, asserted water rights under the federal reserved water rights doctrine. The Idaho Department of Water Resources, also an intervenor, contested that claim. The district court ruled that the United States did hold reserved water rights, but required that those reserved rights be quantified. On appeal from that decision, this Court ruled that the United States is required by state law to quantify the amount of water claimed under the reservation doctrine at the time of a general adjudication of water rights. This Court remanded the case to allow the United States an opportunity to quantify those rights. *Avondale Irrigation Dist. v. North Idaho Properties, Inc. (Avondale I),* 96 Idaho 1, 523 P.2d 818 (1974). On remand, the district court reopened the proceedings for quantification of the reserved water rights, but in its order provided that "the Idaho Department of Water Resources may . . raise the issue of law of whether the United States is entitled to include in such quantification minimum stream flows."

The United States claimed a non-consumptive right dating from November 6, 1906, the date the Coeur d'Alene National Forest was reserved by presidential proclamation, to the entire natural flow of the Yellow Banks, Mokins and Hayden Creeks within the boundaries of the Coeur d'Alene National Forest. All three creeks originate in the Coeur d'Alene National Forest and are tributaries of Hayden Lake. The Yellow Banks and Hayden Creeks enter Hayden Lake on non-federal land. Mokins Creek enters the lake on national forest land, but only after crossing two intervening parcels of non-federal land. Various witnesses called by the United States testified that the entire natural flow of all three creeks is necessary to preserve fish cultures and for wildlife, recreational and aesthetic purposes. The testimony introduced at trial, however, primarily supported the claim that the entire natural flow is necessary to preserve the fish habitat. In addition, the United States introduced in evidence the historical maximum stream flow and annual volume within the boundaries of the national forest of these three creeks.[4] The United States also claimed a minimum stream flow of 3.57 cfs from April 1 to June 30 of each year in the downstream part of Hayden Creek flowing through private land. Testimony indicated that this minimum stream flow is necessary to enable fish in Hayden Lake to swim upstream to the national forest for spawning.

The district court concluded that a claim to the entire natural flow is not a sufficient quantification and therefore ruled that any non-consumptive water rights of the United States would be limited to those maximum quantities specifically set out in evidence; any water in excess of those amounts would be subject to appropriation. The district court further ruled that the purposes for which the United States claimed these non-consumptive water rights—preservation of fish and wildlife, recreation and aesthetics, and fire and erosion control—were not the purposes for which the national forest was created and therefore the United States was not entitled to water rights for those purposes under the federal reserved water

these judgments was separately appealable to this Court. When the judgment entered April 14, 1975, was appealed to this Court, the district court was divested of jurisdiction over the matter. *Coeur d'Alene Turf Club, Inc. v. Cogswell,* 93 Idaho 324, 461 P.2d 107 (1969); *Dolbeer v. Harten,* 91 Idaho 141, 417 P.2d 407 (1965), on rehearing (1966). It was not until the dismissal of the first appeal was filed in the district court on November 2, 1976, that there was pending in the district court a final judgment, although composed of two separate documents, adjudicating the rights of all the parties and from which an appeal could properly be taken. Thus, for purposes of I.C. § 13–201, the 60 day limitation period began to run November 2, 1976. This appeal was filed December 29, 1976, well within that limitation period.

4. Hayden—790 cfs, 22,020 acre ft./year; Yellow Banks, 136.94 cfs, 2,440.62 acre ft./year; Mokins—170.73 cfs, 3,336.72 acre ft./year.

rights doctrine. The district court concluded that the forest was reserved only for purposes of timber management and watershed protection, and found that the United States had failed to prove that a non-consumptive right to the entire natural flow or any minimum stream flow was necessary to accomplish these two purposes. The district court further concluded that the reservation doctrine does not apply to those portions of a stream crossing private land and therefore ruled that the United States was not entitled to the seasonal minimum flow of 3.57 cfs in the downstream portion of Hayden Creek on private land. The United States has appealed from that decision.[5]

In these two appeals the United States is not arguing that it has consumptive rights, rights to divert and consume the entire natural flow of the streams, but only that it has the right to the non-consumptive or instream use of the natural flow. Accordingly, the water rights claimed by the United States generally would not affect appropriators downstream of the national forests. The exceptions would be the minimum stream flow claimed in the portion of Hayden Creek crossing private land downstream of the Coeur d'Alene National Forest and downstream appropriators who divert water upstream on the national forest for gravity flow or storage purposes. In theory the rights claimed by the United States would affect upstream users, but in these cases the streams involved all originate within the national forests. The claimed water rights would affect appropriative rights appurtenant to non-federal land within these national forests. The amount of non-federal land within the boundaries of these national forests is not insignificant. Testimony in *Avondale*, for example, indicated that within the Coeur d'Alene National Forest there are approximately 44,000 privately owned acres and 13,480 acres owned by the State of Idaho.

The United States claims that these non-consumptive water rights date from the time these national forests were created—the Coeur d'Alene National Forest in 1906, the Caribou National Forest in 1907. Accordingly, the United States acknowledges that the reserved rights it claims would be subordinate to water rights with priority dates prior to the creation of these national forests.

The Idaho Department of Water Resources does not dispute the federal reserved water rights doctrine or its applicability to these cases, but does dispute: (1) that the non-consumptive rights claimed by the United States are necessary to accomplish the purposes for which these two national forests were created; (2) that a claim to the entire natural flow is a sufficient quantification of those rights; and (3), in *Avondale*, that the United States is entitled to a right to a minimum stream flow downstream of the national forest on private land.

### III

It is now well established that when the federal government reserves land from the public domain it also, by implication, reserves rights to the appurtenant and then unappropriated water necessary to accomplish the purpose of the reservation. This reserved water right vests on the date of the reservation and is superior to the rights of subsequent appropriators. *Cappaert v. United States*, 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976); *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *United States v. District Court for Eagle County*, 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971); *Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908); *see* Ranquist, The Winters Doctrine and How It Grew: Federal Reservation of Rights to the Use of Water, 1975 B.Y.U.L.Rev. 639.

---

5. In both cases the district courts exercised jurisdiction over the United States pursuant to 43 U.S.C. § 666. This Court has jurisdiction on appeal pursuant to I.C. § 13–201, since repealed and replaced by I.A.R. 11.

Although originating in a case concerning water rights on an Indian reservation, *Winters v. United States, supra,* this reserved water rights doctrine has been held to apply to other federal enclaves including national forests. *Cappaert v. United States, supra* ; *United States v. District Court for Eagle County, supra* ; *Arizona v. California, supra.* This doctrine was most recently considered by the United States Supreme Court in *Cappaert v. United States, supra.* That case involved reserved water rights in an underground pool in Devil's Hole National Monument inhabited by a unique species of desert fish. Heavy pumping of groundwater for irrigation purposes on private land several miles away caused the water level in the pool to drop below the minimum level necessary for propagation of the rare fish species. The Supreme Court concluded that the protection of this rare fish species was a purpose for which the Devil's Hole National Monument was created in 1952. Therefore the Court held that under the reserved water rights doctrine the United States was entitled to have the groundwater pumping, which had commenced subsequent to the creation of the Devil's Hole National Monument, curtailed, but only to the extent necessary to preserve the minimum water level necessary for preservation of the fish species.

■ Similarly, in these two cases the United States asserts a reserved non-consumptive right to the natural flow of these several streams in two national forests. However, as the Supreme Court made clear in *Cappaert,* the United States is entitled to such a water right only if, and only to the extent it "is necessary to fulfill the purpose of the reservation, no more." 426 U.S. at 141, 96 S.Ct. at 2071.

In *Cappaert* the United States Supreme Court ascertained the purpose for which the Devil's Hole National Monument was re-

served by examining the presidential proclamation creating it and the statutory authorization for the reservation. We must do the same in these cases in order to determine the purposes for which the Coeur d'Alene and Caribou National Forests were created.

These two national forests were created by presidential proclamations—the Coeur d'Alene National Forest on November 6, 1906, 34 Stat. 3256, and the Caribou National Forest on January 15, 1907, 34 Stat. 3267.[6] These proclamations do not indicate the purpose for the reservations, but do state that the reservations were made pursuant to section 24 of the Creative Act of 1891. Section 24 of that Act states:

"The President of the United States may, from time to time, set apart and reserve, in any State or Territory having public land bearing forests, in any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, as [national forests], and the President shall, by public proclamation, declare the establishment of such [forests] and the limits thereof." Ch. 561, § 24, 26 Stat. 1095, 1103 (1891) (codified at 16 U.S.C. § 471).

That statute does not state the purpose for which the President may reserve public lands as national forests, just the requirement that the public land reserved be covered with timber or undergrowth. However, the congressional debates and memorials read in those debates suggest that Congress was concerned with the preservation of timber stands in order to assure a continuous supply of timber and the protection of watersheds in mountainous areas in order to control the water flows in the lower valleys.[7]

Six years later Congress passed what is now referred to as the Organic Administration Act of 1897.[8] That Act provided that

---

6. The reservations are referred to as forest reserves in the presidential proclamations and early statutes. The name was later changed to national forest. Ch. 2907, § 1, 34 Stat. 1256, 1269 (1907).

7. *See* 21 Cong.Rec. 2537–39 (1890); 22 Cong. Rec. 3611–16 (1891).

8. What is presently called the Organic Act of 1897 was passed as a rider to the Sundry Civil Expense Appropriation Act of 1897, ch. 2, § 1, 30 Stat. 11, 34–36, and is generally codified at

national forests were to be established in accordance with the following provisions:

"All public lands heretofore designated and reserved by the President of the United States under the provisions of the Act approved March third, eighteen hundred and ninety-one, the orders for which shall be and remain in full force and effect, unsuspended and unrevoked, and all public lands that may hereafter be set aside and reserved as [national forests] under said Act, shall be as far as practicable controlled and administered in accordance with the following provisions:

"No [national forest] shall be established, except to improve and protect the forest within the reservations, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States; but it is not the purpose or intent of these provisions, or of the Act providing for such reservations, to authorize the inclusion therein of lands more valuable for the mineral therein, or for agricultural purposes, than for forest purposes." Ch. 2, § 1, 30 Stat. 11, 34–35 (1897) (codified at 16 U.S.C. § 475).

In this Act Congress stated that national forests were to be established for the purpose of securing favorable conditions of water flows and a continuous supply of

timber. The United States argues that the phrase "to improve and protect the forest within the boundaries" is a separate and distinct purpose for the creation of national forests and refers not only to the protection of trees, but also to the protection and improvement of the entire forest ecosystem, including fish and wildlife, and the forest's aesthetic and recreational qualities. This argument, however, finds no support in the legislative history of the Act. Despite repeated references in the congressional debates to the need to preserve timber resources and protect watersheds, no mention is made of fish and wildlife or the aesthetic and recreational qualities of the forests.[9] Moreover, the Organic Act expressly provides that water within the national forest may be used for domestic, mining, milling and irrigation purposes.[10] It would indeed be anomalous for this Court to infer, as the United States asks it to do in these cases, a congressional intent to reserve the entire natural flow of these streams when Congress explicitly authorized and contemplated private consumptive use of these same streams.

The Organic Act further provides that it is not to be "construed to prohibit the egress and ingress of actual settlers" or to "prohibit any person from entering upon such forest reservation for all proper and lawful purposes."[11] The Secretary of Agri-

16 U.S.C. §§ 473–478, 479–482, 551. *See* 30 Cong.Rec. 899 (1897).

**9.** *See, e. g.,* 30 Cong.Rec. 899–917, 963–1010 (1897) (debates preceding the enactment of the Organic Act of 1897); 25 Cong.Rec. 2371–75, 2430–35 (1893), and 27 Cong.Rec. 85–86, 109–15 (1894) (committee report and debates on the 1892 McRae Bill, H.R. 119. This bill, which was passed by the House but not the Senate, is the forerunner of and substantially the same as the Organic Act of 1897). *See generally* Bassman, The 1897 Organic Act: A Historical Perspective, 7 Nat.Res.Law. 503 (1974).

**10.** "All waters on such reservations may be used for domestic, mining, milling, or irrigation purposes, under the laws of the State wherein such forest reservations are situated, or under the laws of the United States and the rules and regulations established thereunder." Ch. 2, § 1, 30 Stat. 11, 36 (1897) (codified at 16 U.S.C. § 481).

**11.** "Nothing herein shall be construed as prohibiting the egress or ingress of actual settlers residing within the boundaries of such reservations, or from crossing the same to and from their property or homes; and such wagon roads and other improvements may be constructed thereon as may be necessary to reach their homes and to utilize their property under such rules and regulations as may be prescribed by the Secretary of [Agriculture]. Nor shall anything herein prohibit any person from entering upon such forest reservations for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof: *Provided,* That such persons comply with the rules and regulations covering such forest reservations." Ch. 2, § 1, 30 Stat. 11, 36 (1897) (codified at 16 U.S.C. § 478).

culture[12] is also authorized to "regulate their occupancy and use."[13] The United States argues that this mandate for regulation of the occupancy and use of the forests indicates that Congress envisioned uses broader than timber management and watershed protection. We agree that Congress contemplated that the public land reserved as national forests would continue to serve a variety of public uses. In *United States v. Grimaud*, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911), the United States Supreme Court stated:

> "From the various acts relating to the establishment and management of forest reservations, it appears that they were intended 'to improve and protect the forest and to secure favorable conditions of water flows.' It was declared that the act should not be 'construed to prohibit the egress and ingress of actual settlers' residing therein, nor to 'prohibit any person from entering upon such forest reservations for all proper and lawful purposes, . . .' (Citations omitted). It was also declared that the Secretary 'may make such rules and regulations and establish such service as will insure the objects of such reservations; namely, to regulate their occupancy and use, and to preserve the forests thereon from destruction; . . .' (Citations omitted). "Under these acts, therefore, any use of the reservation for grazing or other lawful purpose was required to be subject to the rules and regulations established by the Secretary of Agriculture. To pasture sheep and cattle on the reservation, at will and without restraint, might interfere seriously with the accomplishment of the purposes for which they were established. But a limited and regulated use for pasturage might not be inconsistent

with the object sought to be attained by the statute. The determination of such questions, however, was a matter of administrative detail. What might be harmless in one forest might be harmful to another. What might be injurious at one stage of timber growth, or at one season of the year, might not be so at another." *Id.* at 515–516, 31 S.Ct. at 482.

Congress chose not to prohibit all public use of the national forests, but chose to permit lawful uses of the forest land and water subject to regulation to insure that such uses did not interfere with the purposes, timber management and watershed protection, for which the reservations were created. However, the diverse uses which the public has made of the forests cannot be equated with the purposes for which they were originally created. *Mimbres Valley Irr. Co. v. Salopek*, 90 N.M. 410, 564 P.2d 615 (1977), *cert. granted sub nom. United States v. New Mexico*, —— U.S. ——, 98 S.Ct. 716, 54 L.Ed.2d 750 (1978). *See also McMichael v. United States*, 355 F.2d 283 (9th Cir. 1965). Had Congress intended that national forests be created for the purposes of recreation, aesthetics, and fish and wildlife preservation, Congress would have so stated as it did in 1890 when Congress set aside public lands in California as "reserved forest lands" for the "preservation from injury all . . . natural curiosities or wonders . . . in their natural condition [and protection of] fish and game. . . ." Ch. 1263, §§ 1 & 2, 26 Stat. 650–51 (1890), and in 1916 in the National Park Service Act which provides that the "fundamental purpose of the said parks, monuments and reservations . . . is to conserve the scenery and the natural and historic objects and the wildlife therein

---

12. The "forest reserves" were originally administered by the Secretary of Interior. In 1905 Congress transferred control to the Secretary of Agriculture. Ch. 288, § 1, 33 Stat. 628 (1905) (codified at 16 U.S.C. § 472).

13. "The Secretary of [Agriculture] shall make provisions for the protection against destruction by fire and depredations upon the public forests and forest reservations which may have been set aside or which may be hereafter set

aside under the said Act of March third, eighteen hundred and ninety-one, and which may be continued; and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction; . . .." Ch. 2, § 1, 30 Stat. 11, 35 (1897) (codified at 16 U.S.C. § 551).

. . . ." Ch. 408, § 1, 39 Stat. 535 (1916) (codified at 16 U.S.C. § 1). *See Cappaert v. United States, supra.*

The United States also argues that the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. § 528, ratifies these additional purposes—recreation, aesthetics, and fish and wildlife preservation—as being among the original purposes for the Creative and Organic Acts. The Multiple-Use Sustained-Yield Act provides in part:

"It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes. The purposes of sections 528 to 531 of this title are declared to be supplemental to, but not in derogation of, the purposes for which the national forests were established as set forth in section 475 of this title." 16 U.S.C. § 528.

In response to this same argument, the New Mexico Supreme Court in *Mimbres Valley Irr. Co. v. Salopek, supra*, recently concluded:

"The Multiple-Use Sustained-Yield Act can just as easily be interpreted to exclude the additional purposes as part of the original intent of the Organic Act. The fact that Congress declared them to be 'supplemental to' the purposes for which the national forests were established clearly indicates that Congress did not envision them as having been included in the original Act. The Multiple-Use Sustained-Yield Act of 1960 does not have a retroactive effect nor can it broaden the purposes for which the Gila National Forest was established under the Organic Act of 1897.

"We thus conclude that the original purposes for which the Gila National Forest was created were to insure favorable conditions of water flow and to furnish a continuous supply of timber. Recreational purposes and minimum instream flows were not contemplated." *Id.*, 564 P.2d at 618.

We likewise conclude that the purposes for which the forests were created are de-termined by the law in existence at the time of their creation, and that the additional "supplemental" purposes described were not among those for which national forests were created pursuant to the Creative and Organic Acts. *See West Virginia Div. of Izaak Walton League of Am., Inc. v. Butz*, 522 F.2d 945 (4th Cir. 1975).

We appreciate the growing public concern for the protection of fish and wildlife and the preservation of the aesthetic and environmental qualities of the national forests. We are also sensitively aware of the increasing use of these forests for recreational purposes. We are likewise aware that in an arid state like Idaho there often is simply not enough water to fully accommodate all the worthwhile but competing uses. However, the United States Supreme Court made it very clear in *Cappaert* that claims for federal reserved rights are not to be analyzed in terms of an equitable balancing of competing interests, and we do not do so in these cases. Rather, the United States is entitled to previously unappropriated waters necessary to accomplish the purpose for which the reservations were originally created—no more and no less.

We conclude, therefore, that the Coeur d'Alene and Caribou National Forests were created pursuant to the Creative and Organic Acts for the purpose of preserving a perpetual supply of timber and protecting watersheds to secure favorable conditions of water flows. *United States v. Grimaud, supra; Light v. United States*, 220 U.S. 523, 31 S.Ct. 485, 55 L.Ed. 570 (1911); *United States v. Shannon*, 160 F. 870 (9th Cir. 1908); *Honchok v. Hardin*, 326 F.Supp. 988 (D.Md.1971); *United States v. Johnston*, 38 F.Supp. 4 (S.D.W.Va.1941); *Mimbres Valley Irr. Co. v. Salopek, supra*. The preservation of fish cultures and habitats and wildlife, and recreational and aesthetic purposes were not contemplated. *Mimbres Valley Irr. Co. v. Salopek, supra*. Accordingly, any non-consumptive water rights reserved by the United States in these two national forests are limited to the amount necessary to accomplish the purposes of timber and watershed protection.

## IV

In its conclusions of law in *Avondale* the district court ruled that fire and erosion control were not among the purposes for which the Coeur d'Alene National Forest was created. This conclusion was erroneous. The control and prevention of forest fires is an integral part of the greater purpose of timber protection and a purpose clearly contemplated by Congress. Bassman, The 1897 Organic Act: A Historical Perspective, 7 Nat.Res.Law. 503 (1974). Similarly, erosion control is an integral part of watershed protection. However, a review of the record in *Avondale* reveals no testimony or other evidence that the non-consumptive use of the entire natural flow or any minimum stream flow is necessary for fire or erosion control.[14] On the basis of evidence adduced at trial, we agree with the district court that the accomplishment of the purposes of timber and watershed protection in the Coeur d'Alene National Forest does not require any minimum stream flow in the Hayden, Yellow Banks and Mokins Creeks. We have already concluded that the propagation of fish is not a purpose for which the Coeur d'Alene National Forest was created. It follows, therefore, that the United States is not entitled to a minimum stream flow in the downstream portion of Hayden Creek crossing private land to enable fish to spawn in the national forest. For these reasons, we affirm the district court's decision in *Avondale*.

## V

In *Soderman* the district court found that:

"[Finding of Fact] 6. The witnesses offered by the United States testified and I find that the non-consumptive use claimed under the federally reserved water right doctrine is necessary in this particular case in order to preserve the forest ecosystems, maintain timber growth, serve as a fire barrier, and provide vegetation and a stream bed conducive to maintenance of a viable fish hatchery for eastern brook trout. A reduction in the natural flow of the stream would destroy the aquatic fishery resources by degrading habitat, degrading beneficial cover of overhanging banks and bank vegetation which extends into the streamflow.

"[Finding of Fact] 7. The evidence also established wildlife and recreational usage of the natural flow of the three streams and that each stream adds to the aesthetic beauty of the forest as an integral segment and part of the forest reserve.

"[Finding of Fact] 8. The non-consumptive use claimed by the United States will preserve the streams in their natural condition for the use and benefit of the public and is also necessary for animal life, fishery, and recreational uses."

Some of the purposes stated by the district court—timber growth and fire barriers—are of course part of the larger purpose of timber protection and therefore proper purposes for which the United States may claim a reserved water right. However, the other purposes forming the basis of the district court's decision—preservation of fish and wildlife, recreation, and aesthetics—are not. Since the district court did not find whether the entire natural flow of these streams is necessary for these purposes collectively or individually, we remand the case for further proceedings to determine what non-consumptive rights, if any, are necessary for the purposes of timber and watershed protection.

## VI

Assuming *arguendo* that on remand in *Soderman II* the United States is able to prove that a non-consumptive right to the entire natural flow is necessary for these two purposes, the question whether the en-

---

14. Robert Rice, Deputy Forest Supervisor for the Idaho Panhandle National Forest, testified that the streams are a source for filling small tankers used in fighting forest fires. However, that reference is clearly to a consumptive use of the stream. Claims to consumptive uses are not part of this appeal, but have been resolved in earlier proceedings.

tire natural flow is a sufficient quantification of that right will again arise. Therefore, we consider that issue at this time. I.C. § 1–205.

■■ In *Avondale I* we held that "under 43 U.S.C. § 666, the United States is bound by Idaho state law, and therefore must quantify the amount of water claimed under the reservation doctrine at the time of the general adjudication of water rights." 96 Idaho at 4–5, 523 P.2d at 821–822. In a footnote we also stated:

"10. I.C. 42–1409. Note that reserved rights, unlike state created appropriative rights, do not depend upon diversion from the stream and application to beneficial use. 19 Stan.L.R. 1, at p. 65 (1967); *Arizona v. California, supra*; National Water Commission Report, Federal State Relations in Water Law, *supra*, at p. 147j. Likewise, since the doctrine is based upon the supremacy clause, it supercedes Idaho law on speculative water rights (*see Lemmon v. Hardy*, 95 Idaho 778, 519 P.2d 1168 (1974)) since some speculation is necessarily required in a present quantification of reserved water rights." *Id.* at 5, 523 P.2d at 822.

I.C. § 42–1409, part of the statutes governing the general adjudication of water rights, requires each claimant to file a notice of claim which includes *inter alia* "the quantity of water claimed to be used in cubic feet per second or the quantity of water stored in acre-feet per year." I.C. § 42–1409(b). However, as we noted in *Avondale I*, requirements for water rights under state law, such as diversion and application to beneficial use, and rules against speculative rights are not necessarily applicable to federal reserved rights. Rather, federal law, because of the supremacy clause, supersedes Idaho law and controls the volume and scope of federal reserved rights. *See Cappaert v. United States, supra; United States v. District Court for Eagle County, supra.* Although the United States can be joined in a general adjudication of water rights pursuant to state law and can be required to quantify its reserved

rights pursuant to state law, "the volume and scope of particular reserved rights, are federal questions . . . ." *United States v. District Court for Eagle County, supra* at 527, 91 S.Ct. at 1003.

■ In these cases the United States argues that the right to the non-consumptive use of the entire natural flow of these streams is necessary to accomplish the purpose of the reservation. The periodic natural variations in stream flows with "just the flexibility which nature provides without interference by man" are said to fulfill the varying needs of the United States more effectively than could be done by any attempt to specify these varying needs in terms of cubic feet per second or acre feet. The United States is not arguing that a right to a fixed minimum stream flow, with any excess above the minimum flow available for appropriation, is necessary to accomplish the purposes of the national forests, but that the right to the entire natural flow with all its natural and seasonal variations is necessary for that purpose. Again, assuming *arguendo* that the United States can prove that a right to the entire natural flow is in fact necessary to accomplish the limited purposes for which the Caribou National Forest was established, then the United States would be entitled to that water right under federal law. In such case any application of I.C. § 42–1409 to the United States, which would require the United States to state its claim in cubic feet per second or acre feet and which would have the accompanying effect of making any water in excess of those amounts available for appropriation, might result in a change in the nature and scope of the water rights reserved by the United States pursuant to federal law. Moreover, the reason for requiring the United States to join in a general adjudication of water rights and to quantify its claims pursuant to state law is to insure certainty as to the validity and quantity of the water rights of the water users in the state. *Avondale I, supra.* A claim to the entire flow, if it is necessary, cannot be faulted for uncertainty. Therefore, we conclude that since the nature and scope of reserved rights are determined by

federal law and the application of I.C. § 42–1409 to the peculiar claims of the United States in these cases might result in a change in the nature and scope of those claims, and because the fundamental requirement of certainty is adequately satisfied, a claim to the entire natural flow, *if it is proved to be necessary*, is a sufficient quantification of the reserved rights claimed in these two cases.[15]

However, that does not mean that the United States is entitled to the entire stream flow in the *Soderman* case. There are strict standards which must be met in order for the United States to be entitled to the entire stream flow pursuant to its reserved water rights. In *Cappaert* the United States Supreme Court determined that the preservation of a rare desert fish species was the purpose for the creation of the Devil's Hole National Monument and that unless the water level in a pool in that monument was maintained at a specific minimum level the fish species would become extinct and the congressional purpose defeated. Accordingly, the Supreme Court ruled that under the federal reserved water rights doctrine the United States was entitled to maintain the water level of the pool at the minimum level necessary for preservation of the fish. That minimum level—three feet below a certain brass marker—was actually lower than the level of the pool prior to the inception of groundwater pumping by the Cappaerts, at which time the water level was only 1.2 feet below the brass marker. The Court did not rule that the United States was entitled to that 1.2 foot "natural" level below the marker, or that all groundwater pumping which caused any decrease in the level of the pool must be curtailed. The Court ordered the pumping curtailed only to the extent necessary to maintain the minimum level necessary for the accomplishment of the purpose of the reservation, the propagation of the fish, and no more.

If on remand in *Soderman* the United States can prove that the entire natural flow at all times is necessary to accomplish the purposes of the national forest, timber management and watershed protection, then it is entitled to that entire natural flow. However, water which merely contributes to or is helpful in achieving these purposes but the absence of which would not frustrate their accomplishment does not satisfy the test. A strict standard of necessity must be applied in these cases. *Cappaert v. United States, supra.*

Therefore, if on remand it is found by the district court that at any time in the seasonal and yearly variations in stream flows the entire natural flow will exceed the minimum flow necessary to achieve the purposes for which the Caribou National Forest was created, the court must find the necessary minimum flow so that the marginal excess may be available for use and appropriation. In such case, I.C. § 42–1409 would be appropriately applied to the United States, and it should be required to quantify its water rights in second feet, or acre feet, in order to assure certainty, uniformity and clarity among the water rights of the various users in this state. As with all water litigants, the burden of proving its claim is upon the United States.

*Avondale, affirmed; Soderman, reversed and remanded.*

McFADDEN and BISTLINE, JJ., concur.

SHEPARD, C. J., and DONALDSON, J., concur in Parts I through V.

SHEPARD, Chief Justice, dissenting.

I am unable to agree with and must dissent from Part VI of the majority opinion. In my judgment it errs in holding that the entire natural flow of the streams in question can be a sufficient quantification of the rights of the United States to waters of the streams. Such is merely another way of stating a minimum flow right.

---

**15.** We do not reach the issue whether Idaho law requires in all cases that water rights be stated in cubic feet per second or acre feet per year. *Cf. Village of Peck v. Denison*, 92 Idaho 747, 450 P.2d 310 (1969) (decided prior to the enactment of I.C. § 42–1409 and construing I.C. § 42–102). We decide only that an Idaho statute may not be applied to a federal reserved water right if such application changes the nature and scope of that federal water right.

I would first observe that the holding of the majority here is clearly contradictory to and without so holding overrules the holding of this Court in *Avondale Irrigation District v. North Idaho Properties, Inc.*, 96 Idaho 1, 523 P.2d 818 (1974) (*Avondale I*), "[T]he United States is bound by Idaho state law, and therefore must quantify the amount of water claimed under the reservation doctrine at the time of the general adjudication of water rights." *Id.* at 4–5, 523 P.2d at 821–22 (footnote omitted). I have been cited to no case nor has my research disclosed any language of the U.S. Supreme Court stating that when the United States is a party to a water adjudication proceeding in a state court it need not quantify the water it claims. It is clear to me at least that such an assumption flies in the face of the clear language and intent of the McCarran Amendment, 43 U.S.C. § 666 (1970). The history of the position of the United States in claiming water rights in the West makes clear what the Congress saw as the need for the McCarran Amendment. One cannot have on the one hand an orderly adjudication, administration and use of water and thereby produce an ordered society wherein people can plan and be assured of the future, and on the other hand have an overriding, zealous federal government claim that regardless of almost 100 years of orderly administration in the states, it and it alone will determine its claims to any amount of water in any stream regardless of previous adjudication, administration or use.

The McCarran Amendment requires the federal government to submit its claims to water in streams to the adjudicatory process of the states. It is true that the federal government in those adjudicatory processes may assert "reserved rights" dating back to the establishment by Congress of the particular federal facility. To that extent as stated by the majority "federal law, because of the supremacy clause, supersedes Idaho law and controls the volume and scope of federal reserve rights." That language was used in *Cappaert v. United States*, 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976). I see nothing in the *Cappaert* decision or any previous decisions of the U.S. Supreme Court which even suggests, much less holds, that the United States, although a party to the adjudicatory state process, need not prove the need to its water rights in measurable quantities.

Clearly, in the instant case since we are dealing largely with claimed nonconsumptive uses, diversion and application to a beneficial use may not be required under our statutory scheme if such conflicts with preeminent federal law. I find no inconsistency in that view since the same result was reached in *State Department of Parks v. Idaho Department of Water Administration*, 96 Idaho 440, 530 P.2d 924 (1974), when an Idaho statute authorized and directed appropriation without diversion. That statute conflicted with and controlled over a prior legislative enactment requiring an actual diversion.

I am fortified in my belief and conclusion, as above set forth, by my analysis of the major cases in the field. The first significant case of the U.S. Supreme Court which established the doctrine of federal reserved water rights is *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). *Winters* involved Indian lands in the state of Montana and as stated by Justice McKenna in his preliminary statement which is not part of the opinion,

"In the year 1889, and long prior to the acts of the defendants * * * the United States, through its officers and agents at the reservation, appropriated and took from the river a flow of *1,000 miners' inches* * * *. Afterwards, but a long time prior to the acts of the defendant complained of * * * the Indians residing on the reservation diverted from the river for purpose of irrigation a flow of *10,000 miners' inches* * * *." 207 U.S. at 566, 28 S.Ct. at 208.

The Montana courts enjoined other persons from diverting waters upstream which would prevent the flow of the stream from reaching reservation lands in an amount necessary to satisfy the previously established irrigation needs of the Indians. That

action of the Montana Court was affirmed by the U.S. Supreme Court, but on the basis that there was a federal water reservation dating back to the establishment of the reservation. A close reading of *Winters* might make one speculate whether under the circumstances there was any need for a declaration of federal reserved water rights, since the doctrine of prior appropriation administered by the state courts of Montana would seem to have adequately protected the prior appropriated water rights of the Indians. Nevertheless, the opinion demonstrates the particular and precise quantification of the water involved.

Next came *Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963). The major thrust of that opinion, of course, was the distribution of the waters of the Colorado river as between the various states. It seems as if the claims of the United States for the allocation of certain waters to not only Indian reservations but national forests, recreation and wildlife areas was almost an afterthought. It was only in the very late language of that opinion without any amplification, explanation or rationale that the Court reaffirmed the *Winters* doctrine and extended it beyond Indian reservation lands to national recreation areas and national forests. The Court, in my judgment, had clearly in mind the quantification of water and "the use of enough water from the Colorado to irrigate the irrigable portions of the reserved lands." 373 U.S. at 596, 83 S.Ct. at 1496. There the Court affirmed the master's report which held there was, "reserved for all the reservations * * * about 1,000,000 acre-feet, to be used on around 135,000 irrigable acres of land." *Id.*

Thereafter, of course, came the McCarran Amendment, 43 U.S.C. § 666 (1970), wherein consent was given to join the United States as a defendant in state courts in suits seeking adjudication of water rights.

The *Eagle* series of cases, *United States v. District Court for Eagle County*, 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971); *United States v. District Court for Water*

*Div. No. 5*, 401 U.S. 527, 91 S.Ct. 1003, 28 L.Ed.2d 284 (1971), arose in the Colorado courts and were ultimately decided by the U.S. Supreme Court. They were actions wherein the state of Colorado sought to utilize the provisions of the McCarran Amendment and the United States in turn contended that the McCarran Amendment did not relate to "reserved" waters which had been created in the *Winters* case. The Supreme Court rejected the contentions of the United States and held that the McCarran Amendment was controlling and affirmed the decree entered by the Colorado Supreme Court holding that the McCarran Amendment required the United States to adjudicate its reserved rights in a general state adjudication. Again, I see nothing in the *Eagle* cases which compels the conclusion that federal law will govern over state law in the process of adjudicating water rights of the United States as contrasted with those of private parties. [But see 401 U.S. at 526, 91 S.Ct. 998—also *Cappaert* indicates there is a federal question.] Specifically, I find nothing which would indicate the existence of any federal law which would exempt the federal government from quantifying its reserved water rights.

In March 1976, *Colorado River Water Conservation District v. United States (Akin v. United States)*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483, came down from the U.S. Supreme Court wherein the U.S. Supreme Court tightened down even further its decisions in the *Eagle* cases. There, the United States had attempted to go to the U.S. District Court in Colorado for a determination of its reserved water rights and thereby oust the Colorado courts from the jurisdiction established by the McCarran Amendment. The Supreme Court struck that effort down, albeit in some waffling language relating to the doctrine of abstention. The Court said, among other things in *Akin*,

"The clear federal policy evinced by that legislation [McCarran Amendment] is the avoidance of piecemeal adjudication of water rights in a river system. This policy is akin to that underlying the rule requiring that jurisdiction be yielded to

**44**

the court first acquiring control of property, for the concern in such instances is with *avoiding the generation of additional litigation through permitting inconsistent dispositions of property.* This concern is heightened with respect to *water rights, the relationships among which are highly interdependent.* \* \* \* The consent to jurisdiction given by the McCarran amendment bespeaks a policy that recognizes the availability of comprehensive state systems for adjudication of water rights as the means for achieving these goals." 424 U.S. at 819, 96 S.Ct. at 1247. (Emphasis supplied.)

I would interpret the above language as meaning, at least at this time, that the United States stands on no different basis in an adjudicatory process than any other party excepting only as to the backdating of its water right to the date of the reservation of the particular federal land for the particular federal purpose.

*Cappaert v. United States,* 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976), was decided June 7, 1976, shortly after the *Akin* case. *Cappaert* is unusual in that a state adjudicatory proceeding was held by the state of Nevada. Even though the United States was not a party to the proceeding, officials of the National Parks Service filed protest, appeared and testified and a decree was issued adverse to the position of the United States *and no appeal was taken therefrom.* Thereafter the United States sought and obtained an injunction in United States district court to limit the pumping from certain wells which allegedly lowered the level of the pool within which swam the fabled pup fish. The *Cappaert* opinion is brief, confusing and cryptic. No mention is made of the McCarran amendment nor of the Colorado cases just then recently decided by the U.S. Supreme Court. The reserved water rights doctrine was again affirmed and my best guess would be that *Cappaert* extended the doctrine of reserved federal water rights to ground water. The Court, however, blithely ignored that question since, although enjoining the pumping of underground waters, it simply stated, "Here, however, the water in the pool is

surface water." Nevertheless, I find no language therein which exempts the United States from the necessity of quantifying their claimed water right in a state adjudication process when the United States is a party thereto. Nor do I find any language which provides overriding federal law when the adjudication process is in the state court. It was noted that one of the reasons for the decision was that albeit the United States had filed a protest in the state adjudicatory process and had appeared and testified, nevertheless, it was *not a party to the proceedings.*

From the above I conclude there is no law as enunciated by the U.S. Supreme Court which exempts the federal government from stating its claimed reserved water rights in specific quantities.

In the case at bar the federal government made claim to consumptive water rights in precise quantities of water based on diversion and placement to beneficial use. Some of those consumptive rights were alleged to have a priority of 1882. At the same time and in the same stream the federal government claimed all the water on the basis of a reserved right with a priority of 1907. I cannot understand nor accept that illogical posture of the federal government. As to the exact position of the federal government in this case, I note the opening statement of counsel for the federal government, i. e., "Our right that we're claiming here under the reservation doctrine *is just the right to have water continue to flow in its natural state."* (Emphasis supplied.)

As stated by the federal government witness Hanks,

"Q. Is it possible under what you just said that the United States could claim the entire natural flow of the Salmon River if necessary for [ecosystems] ecural systems?

A. Could be if necessary for [ecosystems] ecural systems."

Even if the majority was correct in its analysis of the law, I submit that the evidence in the instant case was not sufficient to establish the federal government's need

for all the water in the streams. Only two witnesses testified. One was a fisheries expert who opined solely as to the need for minimum flow in the stream to sustain the fish. Under the holding of the majority relating to the established purpose of the national forest land, his testimony was clearly irrelevant. Nevertheless, he was able to quantify that need in terms of 3.4 c. f. s. The remaining witness testified as to aesthetics, i. e., the desire of people to see water, fisheries need, wildlife, livestock watering and a *consumptive* need at campgrounds. All such *needs* are irrelevant under the established purpose for the national forest lands as found by the majority. The sole *need* to which he testified which comports with the national forest purposes was that relating to the need for the streams for fire break protection. As to that he stated:

"Q. How wide are these streams?

A. They're real narrow, I'd say one to two feet.

\* \* \* \* \* \*

Q. But the creeks you're talking about aren't all necessarily an effective fire guard considering the small size?

A. That's true."

I then arrive at my conclusion. Here the federal government desires to assert a right to a minimum flow of water in the particular streams. They attempt to mask their intent by arguing that their needs dictate their usage of water in the streams in a defined, quantifiable amount, to wit, all of it.

I submit that such is not such a required quantification as will permit an orderly adjudication and administration of the waters nor fair usage of the waters as between the government for its reserved rights/needs and those of private appropriators. Such certainly defeats the congressional intent and purpose as expressed in the McCarran Amendment.

It may be that the U.S. Supreme Court will ultimately decide the question in favor of the federal government. Suffice that day should come without encouragement or premature action by this Court.

DONALDSON, J., concurs.