The UNITED STATES of
America, Appellant,

v.

Robert W. JESSE, Water Division No. 2 Engineer; State of Colorado, Department of Natural Resources and all other Departments, Agencies and Divisions, and on behalf of the People of the State of Colorado; City and County of Denver, By and Through its Board of Water Commissioners; Southeastern Colorado Water Conservancy District; Twin Lakes Reservoir and Canal Company; City of Colorado Springs; City of Fountain; Huajatolla Water Users Association; Panadero Ski Corporation, a Colorado corporation; Baker Creek Properties, a partnership; Dwight A. Harrison; J. Lowell Goemmer; Tom L. Watson; Goemmer Land and Livestock Company, a limited partnership; CF & I Steel Corporation; Frank A. Schultz, d/b/a Twin Peak Ranches; Town of Aguilar; Spanish Peaks Soil Conservation District; the City of Cripple Creek; W.J. Runyon, Jr.; William A. Simpson, Jr.; Mount Massive Lakes, Inc., a corporation duly organized and existing under the laws of the State of Colorado, for itself, its members, and stockholders as a class and as individuals; Walter I. Auran; Ralph W. Liedholt; Rosemary B. Liedholt; R. James Nicholson; John W. Nicholson; Sophie M. Nicholson; Board of Water Works of Pueblo, Colorado; Consquistador, Inc.; Louis R. Higby, Jr. and Verna J. Higby; Pinerose Associates; Harlan–Bismuth Association; New Colorado Associates; Trout Creek Associates; Harold C. Ingersoll; St. Charles Mesa Water Association; Pueblo West Metropolitan District; Cucharas Sanitation and Water District; Public Service Company of Colorado, Hydro Production Department; Bessemer Irrigation Ditch Company; Jimmie A. Keeton, Sr.; Colorado River Water Conservation District; John M. May and Frances M. May; Colorado Water Protective and Development Association; Woodmoor Water and Sanitation District No. 1; W. Barry Hill; Purgatoire River Water Conservancy District; Randall L. Schranz and Patricia Ann Schranz; Catlin Canal Company; Fort Lyon Canal Company; Arkansas Valley Ditch Association, for itself and on behalf of its individual members; Huerfano County Water Conservancy District; Vernon L. Watkins; John C. and Rebecca E. Taggart; John L. and Catherine C. Taggart; Roderick G. Senko and Lynda G. Senko; Rock Creek Park Association; Nancy Dean Riegel and Son; Lelan E. and Martha Mary C. Payne; Edgar J. Oliver and Wilma Jean Oliver; Max H. and Rose M. Horne; Merlyn S. Heimbecker and Ellen I. Heimbecker; Judith A. Feagler; Ben and Jan Donahue; Thomas R. Crocker; Louis Magnino; James G. Penchoff; Dennis R. and Connie D. Hendron; Mr. and Mrs. Harry W. Wareham; Lowell D. and Delores J. Peterson; Charles Irwin and Mary Catharyn Irwin; Eric J. Bransby and Mary Ann Bransby; Jewel Sall; Goemmer Brothers; Shirley DeAndrea; City of Trinidad; John Vucetich; Amity Mutual Irrigation Company, District 67 Irrigation Canal Association; Gary C. Potter; City of Victor; Colorado City Metropolitan District, Inc., Appellees.

No. 85SA347.

Supreme Court of Colorado,
En Banc.

Oct. 13, 1987.

As Modified on Denial of Rehearing,
Nov. 2, 1987.

F. Henry Habicht, II, Asst. Atty. Gen., David C. Shilton, Robert L. Klarquist, Washington, D.C., Robert N. Miller, U.S. Atty., John R. Hill, Jr., Denver, for appellant.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Robert A. Hykan, Asst. Atty. Gen., Denver, for appellee State of Colo.

Wayne D. Williams, Michael L. Walker, Casey S. Funk, Denver, Saunders, Snyder, Ross & Dickson, P.C., Jack F. Ross, Glenn G. Saunders, Denver, for appellee City and County of Denver.

Fairfield and Woods, Howard Holme, Kevin B. Pratt, Michael B. Genoways, Denver, for appellee Southeastern Colorado Water Conservancy Dist.

John U. Carlson, Denver, for Twin Lakes Reservoir and Canal Co.

Law Office of Robert F.T. Krassa, P.C., Robert F.T. Krassa, Pueblo, for appellees St. Charles Mesa Water Ass'n and Pueblo West Metropolitan Dist.

Kelly, Stansfield & O'Donnell, Timothy J. Flanagan, Denver, for appellee Public Service Co. of Colorado.

Donald H. Hamburg, Glenwood Springs, for appellee Colorado River Water Conservation Dist.

Mitchell & Mitchell, P.C., Rexford L. Mitchell, Rocky Ford, for appellees Catlin Canal Co. and Arkansas Valley Ditch Ass'n.

Davis, Graham and Stubbs, John M. Sayre, Robert V. Trout, Denver, for amicus curiae Northern Colorado Water Conservancy Dist.

Ward H. Fischer, William R. Fischer, Fort Collins, for amicus curiae Cache La Poudre Water Users Ass'n.

ERICKSON, Justice.

This is an appeal from partial summary judgment entered against the United States in a comprehensive adjudication of water rights in Water Division No. 2. The claims on which summary judgment was granted involve federal reserved water rights in the Pike and San Isabel National Forests, which are located in Water Division No. 2. The United States asserts that the withdrawal of the Pike and San Isabel National Forests from the public domain implicitly reserved appurtenant water necessary to maintain minimum instream flows over the forest lands. In *United States v. City and County of Denver*, 656 P.2d 1 (Colo.1982) (*Denver I*), the United States failed to claim that such rights were necessary to achieve the purposes for which the national forests were created under the Organic Administration Act of 1897, 16 U.S.C. §§ 475-482 (1982) (the Organic Act). The United States now contends that recent advances in the science of fluvial geomorphology demonstrate that minimum instream water flows are necessary to preserve efficient stream channels in the national forests and "to secure favorable conditions of water flows," one of the purposes for which the national forests were created under the Organic Act. The water court for Water Division No. 2 rejected the claim and held (1) that, as a matter of law, the Organic Act did not implicitly reserve appurtenant water necessary to maintain instream water flows in the national forests, and (2) that our decision in *Denver I* collaterally estopped the United States from claiming a reserved right to maintain minimum instream water flows in the national forests. We reverse and remand with directions for further proceedings consistent with this opinion.

I.

## THE FRAMEWORK OF IMPLIED FEDERAL RESERVED WATER RIGHTS

When the United States withdraws land from the public domain and reserves the land for a federal purpose, appurtenant water then unappropriated is implicitly reserved to the extent necessary to accomplish the purpose of the reserva-

tion. *Cappaert v. United States,* 426 U.S. 128, 138, 96 S.Ct. 2062, 2069, 48 L.Ed.2d 523 (1976); *see also United States v. New Mexico,* 438 U.S. 696, 699–700, 98 S.Ct. 3012, 3013–14, 57 L.Ed.2d 1062 (1978); *Denver I,* 656 P.2d 1, 17 (1982). The implied federal right vests on the date of the reservation and is superior to the rights of future appropriators. *Cappaert,* 426 U.S. at 138, 96 S.Ct. at 2069. The United States Supreme Court has recognized implied federal reserved water rights for varied federal reservations, including national forests, monuments, parks, recreation areas, wildlife refuges, and Indian reservations. *See, e.g., New Mexico,* 438 U.S. at 698, 98 S.Ct. at 3013 (the United States implicitly reserved appurtenant water necessary to accomplish the purposes of the Gila National Forest reservation); *Cappaert v. United States,* 426 U.S. at 139, 96 S.Ct. at 2070 (1952 presidential proclamation creating the Devil's Hole National Monument impliedly reserved sufficient water to preserve the Devil's Hole pupfish); *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 805, 96 S.Ct. 1236, 1240, 47 L.Ed.2d 483 (1975) (the reserved water rights of the United States extend to Indian reservations, national parks, and national forests); *Arizona v. California,* 373 U.S. 546, 601, 83 S.Ct. 1468, 1498, 10 L.Ed.2d 542 (1962) (the United States reserved water sufficient for the future requirements of the Lake Mead National Recreation Area, the Havasu Lake National Wildlife Refuge, and the Gila National Forest).

The reserved water rights doctrine must be narrowly construed, *see Denver I,* 656 P.2d at 26, and the right includes "only that amount of water necessary to fulfill the purpose of the reservation, [and] no more," *Cappaert v. United States,* 426 U.S. at 141, 96 S.Ct. at 2071. The application of the doctrine requires a careful examination of the asserted water rights and the specific purposes for which the land was reserved and depends upon the conclusion that the purpose of the reservation

would be *entirely defeated* without the claimed water. *New Mexico,* 438 U.S. at 700, 98 S.Ct. at 3014; *Denver I,* 656 P.2d at 19.

▮ In contrast to the doctrine of prior appropriation, which prevails in most of the western states and recognizes only the right to divert a quantified amount of water at a specific location for a specific purpose, *see* §§ 37–92–103(12), –302, –303, 15 C.R.S. (1973 & 1986 Supp.); *Green v. Chaffee Ditch Co.,* 150 Colo. 91, 371 P.2d 775 (1962), the federal doctrine of reserved water rights vests the United States with a dormant and indefinite right that may not coincide with water uses sanctioned by state law. Boles & Elliot, *United States v. New Mexico and the Course of Federal Reserved Water Rights,* 51 U.Colo.L.Rev. 209, 213 (1980) (hereinafter Boles & Elliot). In a 1973 report to the President and Congress, the National Water Commission identified four characteristics of federal reserved water rights that are incompatible with the doctrine of prior appropriation: (1) the right may be created without diversion or beneficial use; (2) the priority of the right dates from the time of the land withdrawal and not from the date of appropriation; (3) the right is not lost by nonuse; and (4) the measure of the right is quantified only by the amount of water reasonably necessary to satisfy the purposes of the reservation. National Water Commission, *Water Policies for the Future: Final Report to the President and to the Congress* 464 (1973). Because the priority date of the reserved right relates back to the date of the reservation, reserved water rights threaten existing appropriators with divestment of their rights without compensation. Boles & Elliot, 51 U.Colo.L.Rev. at 213.[1]

## II.

### RESERVED WATER RIGHTS IN THE NATIONAL FORESTS

During the last half of the nineteenth century, forests on the public lands were

---

**1.** The above is not intended in any way to limit the application of the McCarran Amendment, 43 U.S.C. § 666 (1976), to matters which arise in specific cases. *See, e.g., United States v. Bell,* 724 P.2d 631 (1986).

seriously endangered by logging, grazing, and fires. *New Mexico*, 438 U.S. at 705, 98 S.Ct. at 3017. As the forest cover was depleted, Congress and the United States Department of the Interior became concerned that stream flow for irrigation purposes would be compromised. *See* S.Exec. Doc. No. 28, 43d Cong., 1st Sess. 2–4 (1874); H.R.Rep. No. 259, 43d Cong., 1st Sess. 6–7, 20–25 (1874). Experience in Europe demonstrated that the depletion of forest areas surrounding the headwaters of rivers removed the natural vegetative cover that ordinarily reduced evaporation and slowed snowmelt and water flow in the rivers during the spring. *Id.* When these natural forces regulating stream flow were removed, rapid snowmelt in the spring caused immediate flooding and an inevitable drought in later months when a steady supply of water was most needed for irrigation. *See* 1 F. Hough, *Report Upon Forestry* 288 (1878).

In response to the depredations on the forest land, Congress enacted the Creative Act of March 3, 1891, ch. 561, § 24, 26 Stat. 1095, 1103 (1891),[2] which authorized the President to "set apart and reserve [lands], in any state or Territory having public land bearing forests, in any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, as public reservations...."

**2.** The Creative Act was repealed by The Federal Land Policy and Management Act of 1976, Pub.L. No. 94–579, § 704(a), 90 Stat. 2743 (1976).

**3.** During the floor debate on the bill, Congressman Flowers of New York stated:

The more you preserve the timber at the headwaters of the South Platte, and on the other side of the Rocky Mountains, of the Humboldt and the Columbia Rivers, the better it will be for that whole country. These streams some day or other will be diverted from their beds for irrigation purposes, and will make fertile the lands in the Rockies and the Nevadas, besides which, it will prevent a great deal of this suffering from overflows.

The more careful the preservation of the timber at the fountain heads of the stream the better it will be for the West and South and for the people who live in the valleys through which these great rivers flow. We of the East suffer from the manner in which the country has been denuded of its timber. For want of forests the lands are drained into the rivers

16 U.S.C. § 471 (repealed 1976). Although the purpose of the Creative Act was not made explicit, the legislative history of the 1891 Act makes clear that its purpose was to preserve natural forest cover in an effort to maintain uniform water flows in streams.[3]

The report of the Secretary of Agriculture in 1892 reflected the Congressional concerns:

There can hardly be any doubt, however, as to what objects and considerations should be kept in view in reserving such lands and withdrawing them from private occupancy. These are first and foremost of economic importance, not only for the present but more specially for the future prosperity of the people residing near such reservations, namely, *first, to assure a continuous forest cover of the soil on mountain slope and crests for the purpose of preserving or equalizing water flow in the streams which are to serve for purposes of irrigation, and to prevent formation of torrents and soil washing;* second, to assure a continuous supply of wood material from the timbered areas by cutting judiciously and with a view to reproduction.

H.R.Exec.Doc. No. 2, 52d Cong., 1st Sess. pt. 6, at 224 (1892) (emphasis added).[4]

immediately after rains, and in the summer they are dried up.
22 Cong.Rec. 3616 (1891).

**4.** After the adoption of the Creative Act, the preservation of the forest cover surrounding the headwaters of rivers in an effort to slow snowmelt, reduce evaporation, and regulate stream flows remained the purpose of the forest reservations. The Secretary of the Interior advised the House of Representatives Committee on Public Lands in 1895:

If the depredations upon [forest land] continue at the present rate, they will in a few years be entirely denuded of their timber and will thus leave the lands surrounding the head waters of irrigating streams subject to the direct rays of the sun, causing waste through floods at an early season of the year and the loss of benefit to the agricultural lands when the water is needed later. If, however, the timber lands are protected and kept intact, the melting of the snow will be gradual, floods will be prevented, and flow will be maintained until late in the spring.

Despite reservations of forest land under the Creative Act, depletion of the forest cover continued, as the new national forests were not adequately protected and irresponsible and indiscriminate logging continued. *New Mexico,* 438 U.S. at 706, 98 S.Ct. at 3017. Comprehensive legislation on the national forests languished in Congress from 1894 to 1896,[5] until widespread withdrawals of forest land by President Cleveland angered many western constituents and prompted Congress to enact the Organic Administration Act of 1897, Ch. 2, 30 Stat. 34 (1897) (the Organic Act) (codified as amended at 16 U.S.C. §§ 475–482 (1976)). *Id.* The Organic Act defined the purposes for which national forests could be reserved and provided a charter for forest management and economic uses within the forests, and provided in pertinent part:

> *No public forest reservation shall be established, except to improve and protect the forest within the reservation, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States;* but it is not the purpose or intent of these provisions, or of the Act providing for such reservations, to authorize the inclusion therein of lands more valuable for the mineral therein, or

for agricultural purposes, than for forest purpose.

30 Stat. 34 (emphasis added). In 1960, the goals of forest management under the Organic Act were expanded with the adoption of the Multiple–Use Sustained–Yield Act, 16 U.S.C. §§ 528–531 (1985) (MUSYA), which stated:

> *It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes. The purposes of [this Act] are declared to be supplemental to, but not in derogation of, the purposes for which the national forests were established as set forth in [the Organic Act].* Nothing herein shall be construed as affecting the jurisdictions or responsibilities of the several states with respect to wildlife and fish on the national forests. Nothing herein shall be construed so as to affect the use or administration of mineral resources of national forest lands or to affect the use or administration of Federal lands not within national forests.

16 U.S.C. § 529 (1985) (emphasis added). Based on MUSYA's expansion of forest management goals, the United States, in adjudications of water rights after the adoption of MUSYA, claimed that it had implied federal reserved water rights in the national forests to maintain minimum in-

---

H.R.Rep. No. 1593, 54th Cong., 1st Sess. 5–6 (1895).

**5.** Advocates of stricter forest control introduced several comprehensive measures in the House and Senate in 1892 and 1893 to provide for a system of supervising and administering the national forests. H.R. 102, S. 2763, S. 3235, 52d Cong. 1st Sess. (1892); H.R. 10101, H.R. 10207, 52 Cong. 2d Sess. (1893). The Report of the Committee on Agriculture and Forestry, which accompanied one such measure, justified the maintenance of the forest reserves as follows:

> It is also established beyond controversy that the forest cover, and especially the forest floor of leaves, twigs, decaying vegetable matter, underbrush, and root system, influence the regularity of waterflow in springs, brooks, and rivers, as well as the state of the ground water level, the presence or absence of an efficient forest cover determining the percentage of subterranean or superficial drainage.
> ....

> The forest floor and the foliage breaking the force of the raindrops prevent a compacting of the soil, it remains porous and permits the water to percolate readily, changing a large amount of it from surface drainage into subterranean channels; the root system, no doubt, works in the same direction. Forest floor and foliage also prevent rapid evaporation, and although the trees consume a large amount of water in their growth, evaporation is the worst dissipator of moisture, and the balance between the consumption and the saving of evaporation by forest growth is largely in favor of this kind of vegetation as compared with any other vegetable cover or with naked ground, provided the forest floor of decayed leaves, twigs, etc., is not destroyed. Furthermore, the melting of snows is retarded under the forest cover, and finally the mechanical retardation of the surface water flow promotes subterranean drainage, insuring to springs a greater supply for a longer time.

S.Rep. No. 1002, 52d Cong., 1st Sess. 5–6 (1892).

stream water flows and natural lake levels for aesthetic, recreational, and wildlife preservation purposes. *See, e.g., Denver I,* 656 P.2d 1 (Colo.1982); *Avondale Irrigation Dist. v. North Idaho Properties, Inc.,* 99 Idaho 30, 577 P.2d 9 (1978); *Mimbres Valley Irrigation Co. v. Salopek,* 90 N.M. 410, 564 P.2d 615 (1977), *aff'd,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978). However, in *United States v. New Mexico,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978), the Supreme Court rejected claims for reserved instream water rights and held that the Organic Act and its predecessor bills evidence a congressional intent to reserve the national forests for only two purposes: (1) to secure favorable conditions of water flows, and (2) to furnish a continuous supply of timber for the use and necessities of the people. 438 U.S. at 707–08, 98 S.Ct. at 3017–18. Because the national forests were reserved for watershed and timber protection alone, the United States could not claim reserved water rights for aesthetic, recreational and wildlife purposes.[6] *Id.* The Supreme Court also held that the adoption of MUSYA neither broadened the water rights impliedly reserved when the national forests were created, nor reserved additional water to achieve the supplemental purposes of preserving recreation, range and wildlife values.

In *Denver I,* 656 P.2d 1 (Colo.1982), we applied *New Mexico* to a general adjudication of water rights in Water Divisions Nos. 4, 5, and 6 in Western Colorado. In *Denver I,* the United States claimed reserved water rights to maintain instream flows in seven national forests. Relying on *New Mexico,* we rejected the United States' claim for water rights to preserve instream flows, and held: (1) that the United States does not have reserved instream flow

rights to protect recreational, scenic, or wildlife values in the national forests, 656 P.2d at 22–23, and (2) that the United States did not claim or prove that instream flow rights were necessary to achieve the national forest purposes of timber and watershed protection, *id.* No appeal was taken by any party from our decision in *Denver I.*

### III.

### DIVISION TWO LITIGATION

In May 1979, the United States was joined as a party to a comprehensive adjudication of water rights in Water Division No. 2, which is comprised of all the lands in Colorado that lie in the drainage basins of the Arkansas and Dry Cimarron rivers and streams tributary to those rivers. *See* § 37–92–201, 15 C.R.S. (1973). In December of that year, the United States filed a general application for adjudication of all its reserved and appropriative water rights in Water Division No. 2, which includes land in the San Isabel and Pike National Forests. Owing to the complexity of the case, the water court for Water Division No. 2 entered an order on December 9, 1980, permitting the United States to file separate, specific applications supplementing the December 1979 general application for water rights, and ordered that each supplemental application would relate back to the date of the general application. The United States, pursuant to the order, filed nineteen supplemental applications in the water court claiming reserved water rights in the Pike and San Isabel National Forests. In each supplemental application, the United States sought adjudication of implied federal reserved water rights to main-

---

**6.** In *New Mexico,* Justice Powell in dissent declared that "the United States is not barred from asserting that rights to minimum instream flows might be necessary for erosion control or fire protection on the basis of the recognized purposes of watershed management and the maintenance of timber." 438 U.S. at 724–25, 98 S.Ct. at 3026 (Powell, J., dissenting) (citation omitted). However, the United States offered no evidence in *New Mexico* to demonstrate that minimum instream flows were needed for timber and watershed protection. Boles & Elliot,

51 U.Colo.Rev. at 229. Also in several recent cases, the United States has failed to adduce sufficient evidence to prove that minimum stream flows are necessary to achieve the narrow purposes of the Organic Act. *See United States v. Alpine Land & Reservoir Co.,* 697 F.2d 851, 858–59 (9th Cir.), *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.1d 170 (1983); *United States v. City of Denver,* 656 P.2d 1, 22–23 (Colo. 1982); *Avondale Irrigation District v. North Idaho Properties, Inc.,* 99 Idaho 30, 39, 577 P.2d 9, 18 (1978).

tain natural lake levels and water flows in streams, creeks, and rivers in the national forests for the purposes of securing favorable conditions of water flows and furnishing a continuous supply of timber.[7] The applications asserted that the water rights were necessary for watershed and stream channel protection, soil conservation, erosion control, flood control, and the growth, management, and production of timber.

On December 18, 1984, the State of Colorado, the Twin Lakes Reservoir and Canal Company, the Southeastern Colorado Water Conservancy District, and the City of Denver, all objectors to the United States' application for reserved and appropriative water rights in Water Division No. 2, filed a motion for partial summary judgment on the United States' claim for reserved water rights to protect instream water flows and natural lake levels in the national forests. The movants relying on collateral estoppel and stare decisis, asserted that our decision in *Denver I* foreclosed any claim for reserved instream flow rights in the national forests. The United States opposed the motion, stating in a memorandum to the water court that *Denver I* was not dispositive of the Division No. 2 adjudication because instream flow rights were claimed in *Denver I* only for the purpose of protecting recreational, scenic, and wildlife values pursuant to MUSYA, and not for the purpose of securing favorable conditions of water flows pursuant to the 1897 Organic Act.

The United States stated in the memorandum that recent advances in the science of "fluvial geomorphology" have shown that strong, recurring instream water flows are necessary to maintain efficient stream channels and to secure favorable conditions of water flows, and that diversions of water within the national forests by private appropriators reduce stream flows and threaten the equilibrium that preserves natural stream channels. In support of its claim, the United States offered the affidavit of Hilton Silvey, a hydrologist employed by the United States Forest Service, which stated that "instream flow requirements must be based on fundamental principles of fluvial geomorphology." One such principle is that frequently recurring flows form and maintain natural stream channels. Unless these flows are available on a frequent basis, the channel system's equilibrium will be changed, thereby diminishing the capacity of the channels to "carry subsequent flows of equal or greater magnitude." Based on its consideration of several factors enumerated in the affidavit, the United States Forest Service concluded "that instream flows are required to maintain the natural channels in a state of relative equilibrium in order to deliver water to the ultimate user under favorable conditions." According to the affidavit, maintenance of instream flows would rarely, if ever, curtail the operation of existing water uses and developments.[8]

---

**7.** The United States also claimed reserved water rights under MUSYA to provide for recreational, range, wildlife, and fish protection in the Pike and San Isabel National Forests. The United States concedes on appeal that the MUSYA reserved no water rights in the national forests. *See New Mexico,* 438 U.S. 713–15, 98 S.Ct. at 3020–21; *Denver I,* 656 P.2d at 24–27.

**8.** Because the affidavit of Hilton L. Silvey was the only evidence submitted by the United States in opposition to the motion for summary judgment, we include a substantial portion of it.

For several years, because of the Forest Service responsibility and concern for watershed management, I and other Forest Service hydrologists have been considering the effects of stream flow on stream channel conditions and the responses of stream channels to changes in the flow regime.

Initial efforts were directed towards evaluating responses of stream channels to in-

creased water yields that can result from land management activities such as timber harvesting. Consideration of stream channel response to increased water yield naturally led to the question of how much stream flow is required in a channel system to maintain the natural capacities for transmitting stream flow and transporting sediment.

Beginning with the early 1970's, our efforts at instream flow quantification were originally concentrated on quantifying those flows necessary for fisheries maintenance. During that time, Forest Service expertise in the complex subject area of fluvial geomorphology was just being established. The concepts of instream flows for stream channel maintenance had not been specifically addressed.

Since the late 1970's, and partially in response to the 1978 U.S. Supreme Court decision in *United States v. New Mexico,* our emphasis on instream flow quantification shifted from fisheries maintenance to stream channel

The water court granted the motion for summary judgment, and concluded that the issue of reserved water rights to maintain instream water flows had been determined

maintenance because the court indicated that fisheries maintenance was not considered a primary purpose of the National Forests.

Beginning in late 1980, and in conjunction with an adjudication in the Big Horn Basin in Wyoming, [the United States Forest Service] began to formulate a procedure and methodology for assessing the quantity, range, and timing of stream flows necessary for maintaining the integrity and stability of stream channels. Until this time, we had assumed that a fisheries maintenance flow would also accomplish most of the channel maintenance function.

[The United States Forest Service] concluded that instream flow requirements for channel maintenance must be based on fundamental principles of fluvial geomorphology which hold that natural stream channels are formed and maintained by frequently recurring flows of water and sediment. Consequently, if such flows are not available on a frequent basis, the natural equilibrium of the channel system will be changed, with a resulting loss in the capacity of the channels to carry subsequent flows of equal or greater magnitude. This led us to conclude that *instream flows are required to maintain the natural channels in a state of relative equilibrium in order to deliver water to the ultimate user under favorable conditions*. The bases for this conclusion are outlined in the paragraphs that follow.

Sediment movement or transport by stream flow is the key element in formation and maintenance of the channel network and is essential to maintaining the balance of equilibrium of the total water delivery system. Following a significant reduction in the naturally occurring range of stream flows, stream channels downstream of the point of flow reduction begin a process of alteration which can be described as a subtle process of instability. In general terms, sediment from side drainages which previously was transported through the system, now begins to accumulate within the main channel, resulting in a gradual elevation of the original channel bottom or reduction in original channel capacity.

When high flows do return to the original channel system on an infrequent basis, they may move some of the accumulated sediment; but most remains, with the result that the now elevated flows attempt to reestablish the original channel capacity, working against formerly stable side-slope materials. The end result over time is instability characterized by significant on-site disturbance within various reaches of the channel and accelerated sediment delivery to the downstream reaches of the system. Of major concern is that once these unstable processes are initiated, they are seldom reversible.

Some specific responses or unfavorable conditions that can be expected to develop as a result of significant long-term stream flow reductions include:

a. Accelerated delivery of channel sediment and channel bank erosion.

b. Reduced channel capacity due to sediment deposition.

c. Intermittent or subterranean flow as a result of channel aggradation, which can result in reduced availability of surface water during low flow periods.

d. Lateral movement of the channel and flood plain encroachment.

e. Accelerated erosion of lands adjacent to the stream, with attendant increases in sediment supplies.

f. Encroachment of riparian vegetation into the channel area, with subsequent reductions in channel capacity.

g. An increase in flood impacts or damage resulting from transmission of flood flows as well as flows of a lower magnitude. Thus, flows that previously would have been retained within the stream banks would, under the reduced channel capacity, become flood flows.

h. An increase in sediment deposition within the containment areas of water storage and diversion facilities, resulting in accelerated loss of water storage capacity in reservoirs and increased maintenance of headgates and ditches.

The maintenance of instream flows within the national forests in Water Division No. 2 would, in rare instances, if at all, curtail the operation of existing water uses and developments. It is not our intent to use such instream flows to reverse the development of present channel conditions that exist below established facilities. Nor do we intend that all such impacted or altered channels should be considered necessarily unsatisfactory. We do believe that, in some cases, adverse channel conditions exist, or may yet develop into problem situations, which may well be avoided in the future, to the benefit of both the water user and the natural delivery system. Generally, instream flow qualification points would be located above existing significant points of diversion, and, as such, we believe the application of instream flow requirements on and within the National Forest would have little, if any, affect on the existing system of water uses and development.

One of the primary purposes of a National Forest is to provide water for beneficial use by private and public users. The provision of water for beneficial use from a National Forest under favorable conditions depends upon the continued integrity and efficient functioning of the natural stream channel conveyance system.

An instream flow is nonconsumptive. It serves to maintain the stream channel delivery systems so that water can be delivered to appropriators under favorable conditions.

adversely to the United States in *Denver I.* Accordingly, the water court held that collateral estoppel and stare decisis prevented the United States from relitigating the issue of instream flow rights in the national forests, and that there was no genuine issue of material fact regarding the United States claim. The judgment was certified as final pursuant to C.R.C.P. 54(b), and this appeal followed. We reverse, and conclude (1) that *Denver I* does not foreclose the United States from asserting a claim that the Organic Act implicitly reserves appurtenant water necessary to maintain instream water flows in the national forests, and (2) that the United States is not barred by the doctrines of collateral estoppel and stare decisis from claiming instream flow rights to achieve the purposes of the Organic Act. Accordingly, we remand to the water court with directions.

### IV.

### INSTREAM FLOWS IN THE NATIONAL FORESTS

■ Until recently, a non-consumptive water right to preserve minimum instream water flows was unknown in Western water law. Boles & Elliot, 51 U.Colo.L.Rev. at 212 (1980); Tarlock, *Appropriation for Instream Flow Maintenance: A Progress Report on "New" Public Western Water Rights,* 1978 Utah L.Rev. 211, 211–12. The doctrine of prior appropriation traditionally protects only the right to divert water from a natural stream and to put that water to a beneficial use. *Denver I,* 656 P.2d a 6–7; *Coffin v. Left Hand Ditch Co.,* 6 Colo. 443 (1882). Water rights for minimum stream flows and other instream uses historically have not been permitted in states that apply the doctrine of prior appropriation. Boles & Elliot, 51 U.Colo.L.Rev. at 212 (1980).

In recent years, however, there has been a new emphasis on the preservation of natural streams and lakes for recreational, aesthetic, and ecological purposes. For example, the National Water Commission in 1973 recommended "that State laws should be improved to provide greater protection of social values in water [including] aesthetic, recreation, [and] fish and wildlife propagation." National Water Commission, *Water Policies for the Future* 271 (1973). In Colorado, the General Assembly in 1973 amended the Water Right Determination and Administration Act of 1969, sections 37–92–101 to –602 (1973 & 1986 Supp.), to authorize the Colorado Water Conservation Board to secure water rights for minimum stream flows "to preserve the natural environment...." § 37–92–102(3), 15 C.R.S. (1973 & 1986 Supp.). Other western states, including California, Montana, Utah, and Washington, have also adopted legislation allowing for the protection of minimum instream flows for recreation and wildlife purposes. *See, e.g.,* Cal.Pub.Res.Code §§ 5093.50–.69 (1984); Mont.Code Ann. § 85–2–316 (1985); Utah Code Ann. § 73–3–8 (Supp.1987); Wash.Rev.Code § 90.22.-010 (1985).

In contrast to the explicit legislative protections enacted by Congress and some states to preserve lake levels and instream flows, the national forests were reserved for a very limited purpose, which did not explicitly include the preservation of instream flows. During deliberation on the Organic Act, Congressional concern remained focused on the preservation of forest growth to slow snowmelt and reduce evaporation, and thereby to protect uniform stream flows outside the forest lands. Congressman McRae of Arkansas, a chief sponsor of the Organic Act, declared:

> [Arkansas] will join heartily with those of the dry and treeless region to protect the forests and preserve the water for useful and healthful purposes....

> Common sense and science, I think, will agree that the forest cover will hold both the rainfall and melting snow, so they will not rush to the streams in torrents in the spring and early summer. We all know that *in a well-timbered country the water goes more gradually into the streams and gives a steadier flow, with fewer overflows and less low water.*

As long as the forests stand, the branches, fallen leaves, and roots will hold much of the rain and snow until summer, and thus furnish water not only for the navigation of our rivers, but also for the irrigation of the deserts. Without forests we may expect our rivers to be swollen as they are now in the springtime, but shallow or dry in the summer and autumn.

. . . .

The objects for which the forest reservations should be made are the protection of the forest growth against destruction by fire and ax, and preservation of forest conditions upon which water conditions and water flow are dependent. *The purpose, therefore, of this bill is to maintain favorable forest conditions, without excluding the use of these reservations for other purposes.* They are not parks set aside for nonuse, but have been established for economic reasons.

30 Cong.Rec. 966 (1897) (emphasis added). The legislative history of the Organic Act is replete with expressions of a concern for the reservation of the national forests as a means of protecting the forest lands in their role as natural regulators of downstream flow.[9] The following statements of western congressmen are illustrative:

[T]he only object of the forest reserves in the State of California is to retain the snows upon the mountains, so that the snows and rains of the spring shall not bring down all at once the full flood upon our valleys, where irrigation is carried on to a great extent and where it is a neces-

sity, as it is for the production of the crops of the great San Joaquin Valley.

. . . .

[T]he more fully you keep the forest in its natural condition with a large amount of undergrowth and decayed timber, the more effectually do you attain the object of keeping the snows upon the mountains.

30 Cong.Rec. 1399 (1897) (statement of Congressman Loud from California).[10]

During the deliberations on the Organic Act, the National Academy of Sciences submitted a report to Congress which amplified the importance of the forests in collecting heavy snows and regulating stream flow:

[The] forests serve to collect and in a measure regulate the flow of streams, the waters of which, carefully conserved and distributed artificially, would render possible the reclamation of vast areas of so-called desert lands. Irrigation systems have been undertaken in many localities under State or corporate control and have been prosecuted until their value has been amply demonstrated, although the one essential condition of their permanent success, the preservation of the forests on high mountain slopes, has been entirely neglected.

S.Doc. No. 105, 55th Cong., 1st Sess. 18 (1897). The United States recognizes a similar purpose for the national forests. The affidavit of Hilton L. Silvey states: "One of the primary purposes of a National Forest is to provide water for beneficial use by private and public users. The provision of water for beneficial use from a

---

**9.** The Affidavit of Hilton L. Silvey, submitted by the United States, demonstrates a similar concern. *See supra* n. 6.

**10.** Two Colorado congressmen added to the debate on the Organic Act with the following concerns:

The object [of the 1891 Act] was to go to the head waters of the White River, to go to the head waters of the other great streams, and there lay off a plat of timber where the snow fell to a great depth, and to provide that timber should not be molested there, not because we wanted to save it for future commercial purposes, but that we wanted to save it for the purpose of conserving the water sup-

ply of these rivers for the use of the valleys below.

30 Cong.Rec. 985 (1897) (statement of Congressman Bell from Colorado).

The original purpose of the enactment of the law of 1891 which authorized the President by proclamation to set aside portions of the public land as forest reservations was to conserve the waters for irrigation, so that the snow which falls in that region during the winter will have shade to protect it from melting until midsummer, until later in the summer, until water is most needed for irrigation. . . .

30 Cong.Rec. 982 (1897) (statement of Congressman Shafroth from Colorado).

National Forest under favorable conditions depends upon the continuing integrity and efficient functioning of the natural stream channel conveyance system."

In *United States v. New Mexico*, 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978), the United States Supreme Court held that the Organic Act and subsequent legislation demonstrated Congress' intent to reserve national forests for only two purposes: "[t]o conserve the water flows, and to furnish a continuous supply of timber for the people." *Id.* at 707, 98 S.Ct. at 3017 (footnote omitted). Although the record of the proceedings on the Organic Act does not disclose an explicit Congressional intent to reserve sufficient water to preserve instream water flows in the national forests, we are not convinced that the federal government, by implication, did not intend to recognize such a right so long as it furthers a primary purpose of the Organic Act.

■ The Organic Act provides for and contemplates the diversion of water by private parties within the national forests in accordance with state law. *See* 16 U.S.C. § 481 (1985) ("All waters within the ... national forests may be used for domestic, mining, milling, or irrigation purposes, under the laws of the State wherein such national forests are situated, or under the laws of the United States and the rules and regulations established thereunder."). In *Denver I*, however, we noted that federal purposes "cannot be subverted by state and private water diversions which jeopardize the existence of the national forests." 656 P.2d at 22. We disposed of a similar claim for implied federal reserved water rights to maintain instream flows in Water Divisions Nos. 4, 5, and 6 in *Denver I*, and upheld the water court's determination "that since the United States did not claim any instream flow rights for the Organic Act of 1897 purposes of watershed and timber protection, the court could not award such water rights." *Id.* at 22. We further stated:

*Nowhere has the United States shown that without instream flows the purposes of the national forests would be*

*defeated.* On the contrary, congressional policies to further the economic development of the West would be frustrated if we were now to hold that the many private appropriators in the national forests must relinquish their long-utilized water rights to downstream appropriators so that the federal government can maintain unneeded minimum stream flows. Many public and private appropriators—cities, industries, farmers, and ranchers—have depended on water diversions from national forest lands high in the Rocky Mountains. Minimum flow rights would upset these long-held expectations in favor of junior appropriators downstream and outside the national forest reservations. We therefore find that the United States does not have an instream flow claim for reserved water rights in the national forests.

656 P.2d at 23 (emphasis added and footnote omitted). In the footnote after the quoted language, we noted that the water court also concluded that no water rights could be awarded to the United States because it *"failed to claim any instream flow rights* in its application for reserved rights in the national forests." *Id.* at n. 37 (emphasis added). We concluded that footnote with this limitation on the scope of our opinion: "Because of our decision on instream flow rights we need not address whether the United States' applications were sufficiently explicit." *Id.* The water court interpreted this footnote to mean that *Denver I* "held *as a matter of law* that instream flow claims could not be recognized under the Organic Act" (emphasis in original). The water court misconstrued our holding in *Denver I.* Our holding in *Denver I* was grounded upon the United States failure to assert a claim under the Organic Act. The master referee determined that the United States had not *"claimed* the right to utilize reserved waters for maintaining minimum stream flows and lake levels pursuant to the forest purpose [of securing favorable conditions of water flows]" (emphasis in original). The trial court upheld that finding, and we stated our agreement in *Denver I.* At the end of the *Denver I* opinion we summarized our

conclusions in upholding and affirming the water court's finding that "the federal government has not claimed or proved instream flow rights necessary to satisfy national forest purposes." *Id.* at 35. Accordingly, any language suggesting that minimum instream flow rights are not to be recognized, as a matter of law, is dictum and not binding on us in the present case.

■ In *Denver I,* we discussed the United States Supreme Court's requirement that the statutory purposes of the reservation in question must be subjected to strict scrutiny to define the scope of appurtenant reserved water rights. "[T]he application of the reserved water rights doctrine requires a careful examination of 'both the asserted water right and the specific purpose for which the land was reserved' and must rest upon a conclusion that 'without the water the purposes of the reservation would be *entirely defeated.*' " *Denver I,* 656 P.2d at 19 (quoting, *New Mexico,* 438 U.S. at 700, 98 S.Ct. at 3014) (emphasis added). If, after a full consideration of the legislative history and factual circumstances, the water court determines that the purpose of the Organic Act will be entirely defeated unless the United States is allowed to maintain minimum instream flows over the forest lands, the United States should be granted such reserved water rights under the Organic Act. Otherwise, the claims should be denied. Because the reserved rights doctrine is implied, rather than expressed, and because of the history of congressional intent relating to federal-state jurisdiction of water allocation, reservations must be strictly limited to the minimum amount of water needed to ensure that the purposes of the reservation will not be entirely defeated. *New Mexico,* 438 U.S. at 701–703, 98 S.Ct. at 3015.[11]

■ Summary judgment is a drastic remedy and should only be granted upon a clear showing that there is no genuine is-

sue of material fact and that the moving party is entitled to judgment as a matter of law. *E.g., Americans United for Separation of Church & State Fund, Inc. v. State,* 648 P.2d 1072 (Colo.1982); *Ginter v. Palmer & Co.,* 196 Colo. 203, 585 P.2d 583 (1978); *Smith v. Mills,* 123 Colo. 11, 225 P.2d 483 (1950). In cases of doubt, summary judgment should be denied. *Abrahamsen v. Mountain States Tel. and Tel. Co.,* 177 Colo. 422, 494 P.2d 1287 (1972). Because *Denver I* does not, as a matter of law, foreclose a claim such as that asserted in the present case, the United States should be granted an opportunity to prove its factual allegations. This court has stressed that federal reserved water rights involve complex issues that should not be determined on the basis of a record devoid of facts. "[T]he very nature of a federal reserved water right forecloses resolution of the issues relating to the nature and extent of the claimed federal right in a factual vacuum." *City and County of Denver v. United States,* 656 P.2d 36, 39 (1982) (*Denver II*). Unlike *Denver I,* which lacked a factual predicate to determine instream flows, the United States affidavit of Hilton L. Silvey sets forth facts that establish genuine issues of material fact. Accordingly, the water court erred in granting partial summary judgment.

## V.

### COLLATERAL ESTOPPEL

■ We also reverse the water court's determination that the United States was collaterally estopped from relitigating the existence of reserved rights to maintain instream water flows in the national forests. Collateral estoppel bars relitigation of an issue determined at a prior proceeding if (1) the issue on which preclusion is asserted is identical to an issue actually litigated and necessarily adjudicated in the prior proceeding; (2) the party against whom estoppel is sought was party

11. On remand, the water court should proceed in the manner we approved in *Denver I* and *City and County of Denver v. United States,* 656 P.2d 36 (1982) (*Denver II*). For each federal claim of a reserved water right, the trier of fact must examine the documents reserving the land from

the public domain and the Organic Act; determine the precise federal purposes to be served by such legislation; determine whether water is essential for the primary purposes of the reservation; and finally determine the precise quantity of water necessary to satisfy such purposes.

to or was in privity with a party to a prior proceeding; (3) there was final judgment on the merits in the prior proceeding; and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding. *Industrial Comm'n. v. Moffat County School Dist. RE No. 1,* 732 P.2d 616, 619–20 (Colo.1987); *Pomeroy v. Waitkus,* 183 Colo. 344, 350–51, 517 P.2d 396, 399 (1973). A fundamental precept of common law adjudication is that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies...." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) (quoting *Southern Pacific R. Co. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897)). In *Denver I,* we found that the United States had not attempted to assert or prove instream flow rights for timber production and water flow purposes under the Organic Act and therefore the issue was not actually litigated and necessarily adjudicated. *Industrial Comm'n,* 732 P.2d at 619 (Colo. 1987). Accordingly, the United States is not collaterally estopped from litigating this claim.

We reverse and remand with directions for further proceedings consistent with this opinion.